(82 Misc. Rep. 247.)

### PEOPLE v. STEEPLECHASE PARK CO. et al.

(Supreme Court, Special Term, Kings County. September, 1913.)

1. NAVIGABLE WATERS (§ 36*)—RIGHTS OF PUBLIC—PASSAGE OVER BEACH OR SHORE—JUS PUBLICUM—JUS PRIVATUM.

   The people hold the fee title to tidal lands of the state, including the beach or foreshore, over which the tide ebbs and flows and for which no patent has been granted, in their sovereign capacity for the benefit of the public, and the right of public passage thereover is of the same nature as the jus publicum of the common law, and cannot be regarded as having had its origin in the jus privatum which is not recognized as part of our common law except in so far as it has devolved upon littoral and riparian owners. Such public right of passage includes, not only the right to pass on foot, but also, where it is physically possible, with vehicles, as a beach constitutes a sort of natural public highway, which, although it may not be subject to all the incidents of a regularly established public highway, is subject to public travel by all means used on the public highways of the state.

   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

2. NAVIGABLE WATERS (§ 37*)—BEACH OR SHORE—CONSTRUCTION OF GRANT TO PRIVATE OWNERS.

   A grant or patent of certain land under water and between high and low water mark, containing no habendum clause or any restrictions upon the grant, but without words to indicate any intention to surrender or extinguish the public right of passage thereover, did not deprive the public of such right.

   [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 201–226, 285; Dec. Dig. § 37.*]

---

3. NAVIGABLE WATERS (§§ 44, 45*)—LITTORAL RIGHTS—ACCRETION AND ERO-
SION.

Under a patent to land bounded by the "Maine Ocean," thereby mean-
ing high-water mark, the patentee and his successors acquired whatever
might be added to the upland by accretion, and lost whatever might be
taken away by erosion, which are both gradual processes; and an ac-
cretion to the shore over which the tide ebbed and flowed, continuing
from 1855 to 1900, a recession of 200 or 250 feet between that date and
1902, and a restoration of 100 feet by 1906, were the operation of erosion
rather than of avulsion.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 266–
282; Dec. Dig. §§ 44, 45.*]

4. NAVIGABLE WATERS (§ 45*)—LITTORAL RIGHTS—"AVULSION."

"Avulsion," which, if applicable to a case where soil is washed away
from land of one owner without being deposited on that of another, is
a sudden pushing back of the shore line due to, or effected by, a violent
storm.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 279,
280; Dec. Dig. § 45.*

For other definitions, see Words and Phrases, vol. 1, p. 655.]

5. NAVIGABLE WATERS (§ 45*)—RIGHTS OF PUBLIC—PASSAGE OVER SHORE.

Where the foreshore, over which the tide ebbs and flows, held by a lit-
toral owner under a patent, recedes as the result of an avulsion, the
owner's boundary may not change, yet the public right of passage, which
is of the same nature as the public right of navigation, is not lost, but
is the same right over the new shore as over the old.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 279,
280; Dec. Dig. § 45.*]

6. EVIDENCE (§ 67*)—PRESUMPTION—CONTINUANCE OF CONDITION SHOWN BY
PHOTOGRAPH.

In the absence of evidence to the contrary, the condition of piers, pavil-
ions, and other encroachments upon a beach or shore, shown by photo-
graphs, will be deemed to have continued to the time of the trial of an
action to enjoin such encroachments.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 87, 88, 103;
Dec. Dig. § 67.*]

7. NAVIGABLE WATERS (§ 43*)—PUBLIC RIGHTS—RIGHTS OF PASSAGE OVER
BEACH—OBSTRUCTIONS—"PURPRESTURE."

Structures, such as fences or barriers, inclosing a part of a beach be-
tween the upland and low-water mark, a pavilion and the platform con-
necting it with the pier, a roller coaster and machine horse railway, in
so far as they encroached upon the beach or foreshore in front of the
upland of private owners, and projected beyond the present mean high-
water line, and interfered with the public right of passage between mean
high-water and mean low-water marks, were "purprestures," which are a
"clandestine encroachment or appropriation upon lands or water that
should be common or public," and public nuisances which would be en-
joined, allowing a pier and a walk constituting proper approaches, and
a jetty constituting a protection both to the beach and to the upland,
to remain, provided that a suitable and convenient means for public pas-
sage on foot and with vehicles should be maintained under or around
them.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 104,
256–265; Dec. Dig. § 43.*

For other definitions, see Words and Phrases, vol. 7, pp. 5867, 5868;
vol. 8, p. 7776.]

Action by the People of the State of New York against the Steeple-
chase Park Company and others for the removal of structures of a

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

permanent nature erected on the beach or foreshore. Judgment for plaintiff, enjoining the maintenance of certain structures, and allowing others to remain under conditions.

Thomas Carmody, Atty. Gen. (William A. McQuaid, Deputy Atty. Gen., of counsel), for the People.

Frank Obernier, of Brooklyn (Samuel S. Whitehouse, of New York City, of counsel), for defendant Huber.

Edward J. Byrne, of Brooklyn, for defendants Steeplechase Park Co. and others.

Hervey, Barber & McKee, of New York City, for defendant Hogg.

BENEDICT, J. This is an action by the people of the state of New York, through the Attorney General, for the removal of certain structures of a permanent nature erected on the beach or foreshore in front of the premises situated between Surf avenue and the Atlantic Ocean at Coney Island, which are occupied as an amusement resort known as Steeplechase Park and having a frontage on the shore of approximately 633 feet.

The defendant Emilie Huber owns the westerly portion of the upland adjacent to the foreshore, extending 297.70 feet from the westerly boundary line in an easterly direction. She claims title in fee to the beach in front of her upland under a patent from the state, which contains no restrictions whatever, but purports to convey a fee. The defendants Steeplechase Park Company own the central portion, extending for a distance of 148.63 feet easterly from the Huber parcel. They claim title to the beach in front of said premises under a patent from the state to Paul Weidman, which contains a restriction against erecting any structure which would interfere with the public's right of passage between high and low water marks. The defendants George C. Tilyou and Elizabeth Burgess Hogg own the next parcel of land to the eastward, extending a distance of 131.11 feet. This leaves a distance of about 56 feet, running from the easterly side of the premises last mentioned to the easterly side of the park, which is not owned by any of the defendants, although the defendants or some of them are in possession thereof. No grant of the water front has been made in respect of any of the premises in question, except as already stated.

The foreshore or beach is approximately 122 feet wide at the westerly side of the park, about 125 feet wide at a point in the middle of the park, and 133 feet wide at the easterly side of the park, thus giving an average for the strip of 126⅔ feet. It is alleged in the complaint and was established upon the trial that the beach or foreshore in front of the upland belonging to or leased by the defendants is fenced off and separated from the beach on either side of it, on the westerly side by a jetty or bulkhead, which is surmounted by a fence of pickets or palings, and on the top of which are strung several strands of wire, and on the easterly side by a fence about 10 feet in height, composed of spiles, posts, planks, boards, dead trees, and barbed wire. There is no opening or passageway through these obstructions between high and low water, and there is no means of access to this part of the beach, excepting through the uplands of the defendants and with

their consent, to obtain which payment of a fee is required. In other words, the beach at this point is treated by the defendants in the same manner with respect to use by the public as is the upland which they own or lease.

In addition to the defenses against the public use of the beach thus established, the defendants Steeplechase Company have constructed and now maintain several other permanent structures which are situated partly upon the upland and partly upon the foreshore, viz., a roofed open pavilion, and the platform connecting the same with the pier, the roller coaster, the machine horse railway, and the pier with the water pipe under it across the beach, and the walk on spiles known as "Tilyou's Walk." All of these structures are shown to rest upon and to be supported by spiles or posts driven into the sand of the beach and connected or tied together with cross-braces of wood or iron at various heights above the beach, and the plaintiffs contend that all these structures except the pier are unlawfully built and maintained by the defendants, or some of them, upon the theory that they prevent, obstruct, or interfere with the free use of the foreshore by the people of the state and constitute an unlawful invasion of the rights of the public freely to pass and repass along the beach or littoral.

It will not be necessary to go into a lengthy examination of the older authorities on the subject of littoral rights, nor is a historical review of their origin and growth needful, however interesting the subject may be, for we have had in this state in recent years two decisions by our Court of Appeals which provide a rule by which the case at bar may be decided. These cases are Town of Brookhaven v. Smith, 188 N. Y. 74, 80 N. E. 665, 9 L. R. A. (N. S.) 326, 11 Ann. Cas. 1, and Barnes v. Midland R. R. Terminal Co., 193 N. Y. 378, 85 N. E. 1093, 127 Am. St. Rep. 962. In the former case it was held that the defendant owner of the upland had the right to erect a pier or dock across the tideway and lands under water so as to make available his long-recognized right of access to the navigable water, and this notwithstanding a grant of the land under water to the plaintiff in fee. In the latter case it was held that the public had a right of passage over the land between high and low water marks, usually spoken of as the foreshore, and that the upland owner must exercise his right to build a wharf or dock in a reasonable manner, so as not to interfere unnecessarily with the public's right of passage. The Barnes Case was carried on appeal to the Court of Appeals by permission; the Appellate Division certifying to the Court of Appeals the following question:

"At the time this action was begun was there any right in the public to pass over the beach between high and low water mark at the defendant's summer resort known as Midland Beach?"

This question was answered in the affirmative. In that case the defendant claimed the foreshore under a patent; but it was held that the patent conferred no rights upon the defendant which it did not have as a littoral proprietor, and hence the case must be regarded as one not involving the question of rights under a patent.

[1] So, in the observations and deductions which I am about to make, I must be considered as speaking of tidal lands of the state for

which no patent has been issued. The Barnes Case recognized a public right of passage over all lands over which the tide ebbs and flows. A public right of passage includes, not only the right to pass on foot, but also, wherever it is physically possible, with vehicles, including vehicles drawn or propelled by horse or other motive power. In other words, as I interpret the Barnes Case, it recognizes that a beach between high and low water marks constitutes a sort of natural public highway, and, although it may not be subject to all the incidents of a regularly established public highway, it is subject to the right of the public to travel over it by all means used on the public highways of the state.

I also think the Barnes Case is authority for the proposition that the people hold the fee title to such tidal lands in their sovereign capacity in trust for the benefit of the public, or, in other words, that this right of public passage over tidal lands is of the same nature as the jus publicum of the ancient English common law, a term which has, I admit, been usually applied to the right of navigation upon navigable waters, but which, under the Barnes Case, seems also applicable to the right of passage over tidal lands. This right of passage, whether recognized by the old common-law writers and decisions or not, but which has been exercised from time immemorial over tidal lands, whether in public or private ownership, is of such a nature that it cannot be regarded as having had its origin in the jus privatum of the crown. Hence the only possible conclusion is that it is a part of the jus publicum, although it may not, perhaps, until recently have been judicially recognized. See R. I. Motor Co. v. City of Providence (R. I.) 55 Atl. 696.

Under the Brookhaven and Barnes Cases, furthermore, it would appear that the common-law distinction between jus privatum and jus publicum is not now recognized in this state. Thus in the Barnes Case it was said:

"It is clearly pointed out in the Brookhaven Case that the rigid rules of the common law of England relating to littoral and riparian rights are not adaptable in every particular to our political and geographical conditions; * * * that the jus privatum of the crown, by which the sovereign of England was deemed to be the absolute owner of the soil of the sea and of the navigable rivers, was totally inapplicable to the conditions of our colonies when the common law was adopted by them, and that this right, from the first settlement of our province, seems to have been abandoned to the proprietors of the upland, so as to have become a common right and thus the common law of the state. * * * Except in so far as the jus privatum of the crown has devolved upon littoral and riparian owners, that right now resides in the people in their *sovereign* capacity."

From this it would seem to follow that whatever rights the state retains in the tidal lands, whether originally derived from the jus privatum or the jus publicum, are now held by the state, not in a private or proprietory capacity, but as sovereign, and hence in trust for the public, the same as the king formerly held title to those rights in lands under water known as the jus publicum.

Coming now to the consideration of the claims of the defendants under the patents above referred to, it is not necessary to determine whether or not the state has power to grant tidal lands to private individuals or corporations, so as to extinguish this public right of pas

sage. At common law the crown had no separate power to surrender the jus publicum, but could do so only in conjunction with the Parliament. People v. N. Y. & S. I. Ferry Co., 68 N. Y. 71, 77.

"Public grants to individuals under which rights are claimed in impairment of public interests are construed strictly against the grantee, for it is reasonable to suppose that if they were intended to have this operation, the intention would have been expressed in plain and explicit language." Id.

[2] So far as the Weidman grant is concerned, under which the defendants other than the defendant Huber claim, the public's right of passage is expressly reserved. The grant to the defendant Huber purports to give and grant unto her, her heirs and assigns, certain land under water and between high and low water mark, described by metes and bounds. It contains no habendum clause. There are no restrictions upon the grant; but on the other hand, there are no words to indicate any intention to surrender or extinguish the public right of passage. Hence I conclude that her grant does not operate to deprive the public of such right. I do not hold that the grant is void, but merely that it is to be construed as subject to the public right aforesaid.

[3, 4] The defendants claim that they are entitled to maintain the present structures on the foreshore, of which complaint is made, because the land whereon they stand was once all upland, and because the receding of the line of high water has, as they claim, been due to avulsion, and not to erosion. The defendants all claim their respective interests in the upland under certain colonial patents issued to the town of Gravesend. These patents bounded the land granted on the south side by the "Maine Ocean." This, of course, meant to high-water mark; and under well-settled rules of law the patentees and their successors in title acquire whatever might be added to the upland by accretion and would lose whatever might be taken away by erosion.

Accretion and erosion are gradual processes. Avulsion, on the other hand, if that term be applicable to a case where soil is washed away from the land of one owner without being deposited upon that of another (see Angell on Tide Waters [2d Ed.] p. 269; 3 Washburn on Real Property, § 1886; 1 Am. & Eng. Ency. of Law [2d Ed.] p. 471, note), is a sudden pushing back of the shore line due to or effected by a violent storm. The evidence shows that in 1855–56 high-water mark at the location in question was near the southerly side of Surf avenue; that thereafter there was an accretion until in 1900 high-water line was distant from Surf avenue from about 900 to 1,000 feet. Then it receded some 200 or 250 feet between 1900 and 1902. Between 1902 and 1906 about 100 feet were regained. Since 1906 the changes have been slight. These encroachments of the sea indicate to my mind the operation of erosion rather than that of avulsion.

There is, however, testimony of some sudden changes, only two of which are definitely fixed as to dates, one since the survey of the mean high-water line of 1913, as shown by plaintiff's Exhibit 12, and one in 1903 to 1904. It does not appear in either of these cases that the washing away of the land was perceptible to one standing by and watching the process, and I very much doubt if I would be justified on the evi-

dence in holding that there was at any time an avulsion. See Philadelphia Co. v. Stimson, 223 U. S. 605, 624, 32 Sup. Ct. 340, 56 L. Ed. 570 et seq.

[5] It is not necessary, however, to determine whether the high-water mark was forced back from where it was in 1900 to its position in 1913 by avulsion or erosion. Although, where the shore recedes as the result of avulsion, the boundary of the littoral proprietor may not change, the public has the same right of passage over the new foreshore as it had over the old—else an avulsion might cut off the public right of passage altogether. This will be yet more evident, when we consider that this public right of passage is of the same nature as the public right of navigation in navigable waters, which, all will agree, would not be lost by any change in the shore line or lines, however sudden. The practical result of the doctrine that title is not lost by avulsion so far as beach lands are concerned is that should the land reappear within the limits of the former boundaries the littoral proprietor may reclaim it. As authority for these propositions, see Mulry v. Norton, 100 N. Y. 424, 3 N. E. 581, 53 Am. Rep. 206.

[6, 7] From the foregoing considerations it follows that the structures which encroach upon the beach in front of the defendants' upland other than the pier and proper approaches thereto, and possibly the jetty, are public nuisances, and should be abated as such. They are "purprestures," a term defined by Littleton as "clandestine encroachment or appropriation upon lands or water that should be common or public" (Co. Litt. 277b), because they encroach upon what, so far as the right of passage is concerned, is to be considered for practical purposes as a public highway. The public has the right to pass over the foreshore, between mean high-water mark and mean low-water mark, at any point, and at all times of day or night, on foot or in vehicles, and to do so on dry ground, except when the state of the tide makes this impossible, subject only to the right of the owner of the upland to maintain a pier or dock and suitable approaches. The photographs put in evidence on the part of the plaintiffs and the defendants clearly show that the defendants' structures seriously interfere with the public rights in this respect. Probably it would always be possible for persons in bathing suits to pass over the beach, outside of the obstructions, as is indicated in some of the photographs; but the defendants are not entitled to require the public to exercise its rights in that costume. So it might also be possible to drive about among the spiles used in the support of the defendants' structures with a dump cart; but the public is not limited to that means of vehicular traffic or agency of user.

It may be observed, in conclusion, that in the absence of evidence to the contrary the condition shown by the photographs must be deemed to have continued to the time of the trial, and the plaintiffs are entitled to a judgment according to the facts as they existed at that time.

Judgment will therefore be rendered for the plaintiffs, enjoining the defendants from maintaining the following structures, namely: The fences or barriers at either side of Steeplechase Park, which are owned

or used by any of the defendants in this action, the luncheon pavilion on the Huber property, and the platform connecting same with the pier, the roller coaster and machine horse railway, in so far as these structures or any of them project beyond the present mean high-water line; which will be decided to be the same as shown on plaintiff's Exhibit 12, unless on the settlement of the judgment it shall be made to appear otherwise. The pier may remain, but suitable means of free passage under or around it must be maintained, and the pipe underneath it must be removed, if it interferes with such passage at any state of the tide. The jetty at the westerly side of the Huber property, constituting, as it does, a protection both to the beach and the upland, may remain, provided that convenient means are provided for passing over it or around the landward end for foot passengers and vehicles, which passage must be left open for all persons freely to travel over. The walk known as "Tilyou's Walk" constitutes a proper approach to the pier, and may remain, provided that a suitable and convenient means for passage underneath it, by persons on foot and for vehicles at all states of the tide, is maintained.

Submit decision and judgment accordingly, giving notice of settlement. Requests to find may be submitted on or before October 6th.