97   461
100   414
100   415

ROBERT F. DUNTON, Trustee,

*vs.*

FREDERICK O. PARKER, and others.

Washington.   Opinion April 27, 1903.

*Deed.   Description.   Sea-Shore.   Flats.   Fish Weir.   Colonial Ordinance, 1641-7.
R. S., c. 3, § 63.*

In construing the description in a deed of land upon the sea-shore, upon the question as to whether or not the shore is included in the conveyance, certain well established general principles must be applied. By reason of the Colonial Ordinance of 1641-7, the owner of the upland adjoining tide-water prima facie owns to low water mark; and does so in fact, unless the presumption is rebutted by proof to the contrary.

It is, of course, true that the owner of upland and shore may separate the ownership by the conveyance of the one and the retention of the other. Where, in the conveyance of land upon the sea-shore, the side boundary line is described as running "to the shore," and the boundary is thence "by the shore," the side line terminates at the inner side of the shore, and shows, in the absence of other calls or circumstances showing a contrary intention, that the inner side of the shore is intended as the boundary. A call in a deed which describes a line as running to a strip of land whether shore or upland, does not carry the line over, across or onto the strip referred to, because the word "to" is a word of exclusion rather than of inclusion.

But it does not by any means follow from the mere fact that the shore of land is made a boundary, or that the boundary is "by the shore" that it is by high water mark. The space between high and low water mark, prop-

erly called the shore, is frequently of many rods in width, it has an outer or seaward side and an inner or upland side, and, nothing else appearing, a boundary by the shore may be as well intended to mean the one as the other. To determine which side of the shore is intended as the boundary it is necessary to look for something further. It follows, that the starting point of a boundary "by the shore" is one of the important elements in throwing light upon the question as to which margin of the shore was intended.

While a boundary which is described as commencing at high water mark on the shore, and thence runs by the shore to another point at high water mark, will, in the absence of other calls or circumstances showing a contrary intention, be construed as excluding the shore, it is equally true that when both the termini of a boundary by the shore are at its outer margin, the shore will be included. This is the necessary and logical result when both the starting and ending points of the boundary by the shore are at the same margin of the shore. The grantor's intention may not be so apparent when one of the termini of the shore boundary is at one margin and the other at the other. But even in such a case when nothing appears in the case showing any motive for a separation of upland and shore, and it does not appear that the shore has any value apart from the upland, and there can be no reason why an owner of both should convey the one and retain the other, if one of the termini of the boundary by the shore is at low water mark, and the other, according to the technical construction of a call in the deed, is at high water mark, the shore will be regarded as included in the conveyance, because of the strong presumption under these circumstances, that such was the intention of the grantor.

In an action under R. S., c. 3, § 63, to recover the penalty therein provided for maintaining a fish weir below or beyond low water mark in front of the shore or flats of the plaintiff, it appears that the plaintiff is the owner of a large tract of land, containing about seventeen hundred acres, known as Petit Manan Point, which extends almost exactly south into the sea. The water upon the east side of the Point is known as Pigeon Hill Bay, and that upon the west side as Dyer's Bay. The Point is nearly separated from the rest of the mainland upon the north by a long narrow inlet, known as the Carrying Place Cove, which extends from Dyer's Bay on the west side of the Point, in a south easterly direction towards, and to within one hundred rods of the eastern shore of the Point.

The plaintiff put into the case a chain of deeds commencing with one in in 1820 and continuing until the conveyances to him as trustee. These deeds admittedly conveyed the upland and brought the title thereto into the plaintiff. The question is whether or not they included and conveyed the shores, and especially the eastern shore in front of which the weir complained of is maintained. The earlier deeds, prior to 1827, unquestionably included the shore. Whether or not the form of description adopted in the various deeds from 1827 up to the time of the conveyance of an undivided portion of the Point by quitclaim deed in 1867 and the convey-

ance of the remainder by a warranty deed in 1874, included the shore, may be doubtful.

But in the warranty deed of 1874, under which the plaintiff claims, the material calls are as follows,—"Beginning at a blue ledge at the southeast corner of the E. A. Hilton lot, so-called," the boundary is then described as extending westerly and northerly by some small lots, "to the Carrying Place Cove, thence following the shore of said Cove northerly and westerly to the waters of Dyer's Bay, thence southerly by the shore to the southern extremity of Petit Manan Point, thence following the shore easterly and northerly to the first mentioned bound."

It will be noticed that in this description the starting point is on the eastern shore of the Point, and the termination of the first boundary line, which extends across the Point to the Carrying Place Cove, is at low water mark, according to the invariable construction of the language of this call. The next boundary, which commences at low water mark and extends by the shore "to the waters of Dyer's Bay," is necessarily by the outer margin of the shore, because both termini are at that margin. From this Point, low water mark at the junction of Dyer's Bay and the Carrying Place Cove, the boundary is described as extending by the shore "to the southern extremity of Petit Manan Point," which means, when considered in connection with the starting point for this last boundary, the southern extremity of the Point at low water mark. So that when the boundary commences to run northerly, "following the shore" from the southern extremity of the Point, it starts at the outer margin of the shore. The form of the description above quoted was followed in substance and effect in all the subsequent deeds until the title to the Point came to the plaintiff.

In accordance with the general principles above stated it is considered by the court that this description discloses an intention on the part of the grantor to include the shore upon the eastern side of this point of land, and that the result is the same whether the southeast corner of the Hilton lot, the point of beginning on the eastern shore, and the terminus of the boundary after it has extended around the whole point, is at high or low water mark. That it is unnecessary to determine the location of the blue ledge referred to in the deed as at the southeast corner of the Hilton lot, because this ledge was evidently selected as a convenient monument for the purpose of indicating the point of beginning at the shore, rather than the identical starting point on the shore with reference to high or low water mark.

It is further considered that this record title to the shore in the plaintiff, which extends back to 1867, and 1874, coupled with evidence showing a possession by the owners of the upland for the entire period entirely consistent with the joint ownership of upland and shore, and showing that no claim to or possession of the shore was ever made or had by previous owners of the upland or by anybody else, is sufficient to authorize the maintenance of this action against these defendants, who do not claim to have any title whatever or right to the possession of the shore. And that consequently it is not necessary to determine the construction of the descriptions in the prior deeds.

Upon the issue of facts presented as to the character of the weir complained of, *held;* that this weir is not one " the materials of which are chiefly removed annually;" and that consequently the statute under which the action is brought is applicable.

The language of this statute, "in front of the shore or flats of another" cannot be taken literally; the statute must contain some limitation other than is expressed therein; the criterion to be applied, in determining whether or not a weir is in front of the shore of a plaintiff, within the meaning of the statute, is whether or not it causes injury of some kind to the plaintiff in the enjoyment of his rights as shore owner; the action cannot be maintained unless it appears that the weir complained of is so near or is so situated, with reference to plaintiff's shore that it in some way injures or injuriously affects him in the enjoyment of his rights as owner.

*Held;* that it sufficiently appears from the situation, and from the evidence, that the defendants' weir injuriously affects the rights of the plaintiff as the shore owner.

See *Sawyer* v. *Beal,* ante, 356.

On report. Judgment for plaintiff.

Action of debt under R. S., c. 3, § 63, to recover the penalty provided for maintaining a fish weir below or beyond low water mark in front of the plaintiff's shore or flats in Pigeon Hill Bay, in Steuben, Washington County.

The case appears in the opinion.

*H. H. Gray and C. B. Donworth,* for plaintiff.

*E. Foster and O. H. Hersey; J. F. Lynch, G. M. Hanson, F. I. Campbell,* for defendants.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, STROUT, SAVAGE, SPEAR, JJ.

WISWELL, C. J. This is an action under R. S., c. 3, § 63, to recover the penalty therein provided for maintaining a fish weir below or beyond low water mark in front of the shore or flats of the plaintiff. The case comes to the law court upon report.

The first objection to the maintenance of the action is, that the plaintiff does not own the flats in front of which the weir was erected, that the deeds in his chain of title to the upland, of which the plaintiff is admittedly the owner, does not include the shore, the space between high and low water mark.

The tract of land owned by the plaintiff, and as to the title to the upland of which there is no question, consists of a large point of land, known as Petit Manan Point, containing about seventeen hundred acres according to the earlier deeds, the area in the later deeds being given as somewhat larger, and extends almost exactly south into the sea.   The water upon the east side of the point is known as Pigeon Hill Bay and that upon the west side as Dyer's Bay.   The point is nearly separated from the rest of the main land upon the north by a long, narrow inlet, known as the Carrying Place Cove, which extends from Dyer's Bay on the west side of the point, in a southeasterly direction towards, and to within about one hundred rods of, according to the plan, the eastern shore of the point.

The plaintiff put into the case a chain of deeds, commencing with one in 1820, and continuing until the conveyances to him as trustee. The question is, whether these deeds conveyed the shores of this point of land, and especially the eastern shore opposite to which the weir complained of is maintained.   The descriptions in these various deeds are not the same but they can be classified into groups.   The first two deeds offered in evidence unquestionably included the shore. The description is:   "Also Petit Manan Point, bounded easterly by Pigeon Hill Bay and westerly by Dyer's Bay."   In the next deed the description is different, but it is said therein that the property is, "the same which was conveyed to me by Samuel Freeman and John Taylor, Esq."   And as the deeds to this grantor from Freeman and Taylor included the shore, this reference to those deeds is sufficient to show that the shore was intended to be included in that conveyance.

In 1827, the grantee in the last deed conveyed the tract of land, employing this language in the description:   "Beginning at the land of Moses McCaleb and running southerly by the shore of Pigeon Hill Bay on the east to Petit Manan Point, its western shore bounded by Dyer's Bay, and northerly by an arm of the sea called the Carrying Place (meaning undoubtedly the Carrying Place Cove) and the land belonging to" various settlers.   An examination of the deed of the Moses McCaleb lot, first conveyed as a separate lot to him in 1824, shows that in accordance with the well settled doctrine in this State, the seaward boundary of this lot was at high water mark.   As the

starting point in the description of the deed of the main tract is at the McCaleb lot, at high water mark, and extends from this starting point "by the shore," it would follow, if nothing else appeared, that this eastern boundary was along the inner margin of the shore or at high water mark. But the language used by the grantor in describing the other boundaries of this tract, where it is contiguous to tide waters, renders the construction of the description of the eastern boundary more doubtful, and might have a controlling effect in ascertaining the true intention of the grantor. It will be noticed that the western and northern boundaries of the point in the description, are Dyer's Bay and the arm of the sea known as the Carrying Place Cove; this language undoubtedly included the shores upon these sides of the tract. Inasmuch as there is no conceivable reason why the shores on the northerly and westerly sides of the point should have been conveyed, and that upon the easterly side retained, and, as in fact, there is no reason apparent or suggested why either of the shores should have been retained by this, or by any of the subsequent grantors, who adopted the same form of description in their various deeds, the fact that the conveyance included the shores upon these two sides might properly have great weight in tending to show that the language used for the purpose of describing the eastern boundary was not used in its technical sense, but that the grantor intended to convey the shore upon the eastern as well as upon the other two sides of the point. See *Storer* v. *Freeman,* 6 Mass. 435. But we do not think it is necessary to determine the question, whether or not the deeds in this group, in view of all the surrounding circumstances, conveyed the shore, because of the description adopted in the later deeds.

The description above quoted was adopted in substance and effect by the grantors in all of the intervening deeds until Franklin Brown and others acquired title to the tract by a quitclaim deed from one John Brown in 1867, and by a warranty deed of one undivided-half of the tract from James B. Mansfield in 1874. In the warranty deed of 1874 the material calls are as follows: "Beginning at a blue ledge at the southeast corner of the E. A. Hilton lot, so-called," the boundary is then described as extending westerly and northerly

by some small lots, "to the Carrying Place Cove, thence following the shore of said Cove northerly and westerly to the waters of Dyer's Bay, thence southerly by the shore to the southern extremity of Petit Manan Point, thence following the shore easterly and northerly to the first mentioned bound."

In determining the construction of the description in a deed of land upon the seashore, certain well established general principles must be applied. By the Colonial Ordinance of 1641–7, it was provided that in such cases, "the proprietor of the land adjoining shall have propriety to low water mark," etc. By reason of this ordinance the owner of the upland adjoining tide water prima facie owns to low water mark; and does so in fact, unless the presumption is rebutted by proof to the contrary. *Doane* v. *Willcutt*, 5 Gray, 335, quoted with approval in *Snow* v. *Mount Desert Island Real Estate Company*, 84 Maine, 14. It is, of course, true that the owner of upland and shore may separate the ownership by the conveyance of one and the retention of the other, and, as has frequently been decided in the states to which this ordinance is applicable, where the side boundary line of the lot conveyed is "to the shore," and thence "by the shore," the side line terminates at the inner side of the shore, and shows, in the absence of other calls or circumstances showing a contrary intention, that the inner side of the shore is intended as the boundary. That is, a call in a deed which describes a line as running to a strip of land, whether shore or upland, does not carry the line over, across or onto the strip referred to, because the word "to" is a word of exclusion rather than of inclusion. This logical result was adopted in the leading case of *Storer* v. *Freeman*, supra, and has since been universally followed in this State.

But it does not by any means follow from the mere fact that the shore of land adjoining tide waters is made a boundary, or that the boundary is "by the shore," that it is by high water mark. The space between high and low water mark, properly called the shore, is frequently of many rods in width, it has an outer or seaward side and an inner or upland side, and, nothing else appearing, a boundary by the shore may be as well intended to mean the one as the other. To determine which side of the shore is intended as the boundary it

is necessary to look for something further. It follows, that the starting point of a boundary "by the shore" is one of the important elements in throwing light upon the question as to which margin of the shore is intended, because, as we have already seen, low water mark is as much the shore as is high water mark.

In the description in this deed the starting point is on the eastern side of the point at the southeast corner of the Hilton lot, but, it will be noticed, that the next call is not by the shore. The first boundary line, which commences at the Hilton lot, extends across the land to the Carrying Place Cove, and the termination of this first line is not the shore, but the Cove. The language is not "to the shore," but "to the Carrying Place Cove," language which has been invariably held to have the effect of carrying the line across the shore to low water mark. . The next boundary, which starts as we have just seen at low water mark in the Cove, is by the shore, necessarily by the outer margin of the shore, because it commences at the outer margin, and it extends "to the waters of Dyer's Bay"; so that here again the termination of the boundary is not the inner but the outer side of the shore, as the expression "to the waters of" a bay, has always been construed as meaning to low water mark. So that the starting point for the next boundary, which extends around the whole point to the place of beginning on the eastern shore, is at low water mark, and the boundary follows the outer margin of the shore to the southern extremity of the point at low water mark. This expression, "southern extremity of Petit Manan Point" is certainly at least as capable of meaning the extremity of the point at low, as at high water mark, and when taken in connection with the starting point shows that the former was intended.

So that when the boundary, according to the description, commences to run northerly, "following the shore" from the southern extremity of the point, it starts at the outer margin of the shore. While a boundary which is described as commencing at high water mark on the shore, and thence runs by the shore to another point at high water mark, will, in the absence of other calls or circumstances showing a contrary intention, be construed as excluding the shore, it is equally true that when both the termini of a boundary by the

shore are at its outer margin, the shore will be included. This is the necessary and logical result when both the starting and ending points of the boundary by the shore are at the same margin of the shore. Of course, the grantor's intention may not be so apparent when one of the termini of the shore boundary is at one margin and the other at the other. But even in such a case when nothing appears in the case showing any motive for a separation of upland and shore, and it does not appear that the shore has any value apart from the upland, and there can be no reason why an owner of both should convey the one and retain the other, if one of the termini of the boundary by the shore is at low water mark, and the other, according to the technical construction of the call in the deed, is at high water mark, the shore will be regarded as included in the conveyance, because of the strong presumption, under these circumstances, that such was the intention of the grantor. *Snow* v. *Mount Desert Island Real Estate Company,* 84 Maine, 14.

In this case, in view of these principles and of the situation, we decide that the description above quoted in the warranty deed of 1874 to Brown and the other grantees, discloses an intention upon the part of the grantor to include the shore upon the eastern side of this point of land; and that the result is the same whether the southeast corner of the Hilton lot, the starting point of the line which extends westerly and northerly to the Carrying Place Cove, and the terminus of the boundary that extends from low water mark in the Carrying Place Cove around the shore by its outer margin, is at high or low water mark. So that it is unnecessary to determine the location of the blue ledge referred to in the deed as at the southeast corner of the Hilton lot. This ledge at the southeast corner of the Hilton lot was evidently selected as a convenient monument for the purpose of indicating the starting point at the shore, rather than the identical starting point on the shore with reference to high or low water mark. *Brackett* v. *Persons Unknown,* 53 Maine, 238.

The lot spoken of in this and the later deeds as the Hilton lot is the same that was earlier referred to as the McCaleb lot, except that while in the first deed of the lot the seaward boundary was so described as to limit it to the inner margin of the shore, in a deed

of this lot in 1848, and in the subsequent deeds thereof, the description carried the shore boundary to low water mark.

The form of the description in the warranty deed of 1874 to Brown and other grantees was followed in effect in all the subsequent deeds until the title to the point came to the plaintiff. While the description in the quit claim deed of 1867 to the same grantees was not precisely similar to that in the warranty deed, it was sufficient, in accordance with the principles which we have referred to, to include the shore upon the eastern side.

So that whether the deeds prior to the time that Brown and others acquired title in 1867 and in 1874, included the shore or not, the plaintiff has introduced a chain of deeds, commencing in 1874 and ending in the conveyances to himself, which include both upland and shore, and evidence from which it appears that the possession of himself and of those under whom he claimed, for the entire period has been entirely consistent with the joint ownership of upland and flats, and that no claim has ever been made by previous owners or by anybody claiming under them to any ownership in the shore. In fact, the evidence is full and uncontradicted that the owners of the upland during this period have had the exclusive and uninterrupted possession of the shore. This tract of land has been principally used for pasturing a large flock of sheep, and has been especially valuable for this purpose because of the great extent of shore which enabled the sheep, averaging about three hundred in number, to there get their food during the winter months.

We think that this record title to the shore since 1874, a period of almost thirty years, with a possession of this character entirely consistent with the ownership of the shore, and without any claim to or possession of the shore by any one else, inconsistent with such ownership, is sufficient to authorize the maintenance of this action against these defendants, who do not claim to have any title whatever or right to the possession of the shore, especially when it is at least doubtful if the earlier deeds, considered in connection with the situation and the other calls therein, showed any intention on the part of the grantors to retain the ownership of the shore. The very nature of the use made of this tract of land, the value of the shores

for this purpose, and their want of value if separated from the upland, would be circumstances of much weight in determining the construction of these earlier deeds, if it were necessary to decide that question.

Another defense relied upon is that the weir complained of is one, "the materials of which are chiefly removed annually", and that consequently, as the weir does not come within the statutory exception to this clause, the statute is not applicable to it. A brief description of the method in which the weir was constructed, and of the portion that is annually removed, will show the fallacy of this contention. The weir consists of a pound and two wings; large posts, seven or eight inches through at the bottom and thirty-five feet or more in length, are driven with the use of a pile-driver, six feet or more into the ground under the sea; these posts are six feet apart around the pound and ten feet apart along the wings; two hundred posts of this character are used. In the space between every two of these large posts, three or four smaller ones are used. They are all joined together by two rows of stay-laths; when the weir is put into condition in the spring, about twelve hundred pieces of birch brush, twenty to twenty-five feet long, are fastened to the stay-laths, extending from high water downward.

In the fall of the year when the weir is being prepared for the winter season, so that it will be as little injured as possible by the floating ice, these pieces of brush and one row of the stay-laths are taken off, and the tops of all the posts, down to about three feet above low water, are removed. Every spring the tops of the posts, the top row of stay-laths and new pieces of brush, the old brush having become generally unsuitable for a second year's use, are put back. The expense of replacing these portions of the weir in the spring, including the costs of the new brush, is trifling. According to the testimony of one of the defendants who is most familiar with this matter, the cost of the new brush is only about twelve dollars, and three or four men can do the work of replacing the top of the posts, the top row of stay-laths and of putting on new brush in about four tides. The case does not show the cost of the building of the substantial portion of the weir which we have above described,

but it is evident that the annual cost of putting the weir into condition for the season's fishing is insignificant compared with the expense of building the permanent and substantial portion of the weir.

Some of the witnesses upon the part of the defense, who testified that the principal part of the materials were annually removed, gave as the reason for their opinion, that the brush was a necessary part of the weir without which it would be useless for the purpose intended. It is undoubtedly an important part in making the weir serviceable for the purpose for which it was intended, but it by no means follows that it is the principal part of the weir. We are satisfied, this issue of fact being submitted for the determination of the court, that the materials of this weir were not chiefly removed annually. The principal part of the weir is the permanent structure consisting of the posts driven close together down into the ground under the sea, which are designed to remain until it becomes necessary, from time to time, to replace them, as the old posts become rotten and decayed.

This court has recently decided that the language of this statute, "in front of the shore or flats of another" cannot be taken literally; that the statute must contain some limitation other than is therein expressed, and that the criterion to be applied in determining whether or not a weir is in front of the shore of a plaintiff, within the meaning of the statute, is whether or not it causes injury of some kind to the plaintiff in the enjoyment of his rights as shore owner; that the action provided by this statute cannot be maintained unless it appears that the weir complained of is so near or is so situated, with reference to a plaintiff's shore, that it in some way injures or injuriously affects him in the enjoyment of his rights as owner. *Sawyer* v. *Beal,* ante, p. 356. In that case the weir was situated a long distance from the plaintiff's shore, upon ledges, which were entirely independent of the shore; there was a channel between the weir and the shore through which vessels of considerable size could pass; the plaintiff had no weir or fishing privilege that was in any way affected by that of the defendant: so that in that case it was decided by the court

that no injury to the plaintiff was shown, and that the action could not be maintained.

The situation in this case is entirely different; when the defendant's weir was first built it was attached to a ledge on the plaintiff's shore, and, although this attachment was later discontinued, during the first part of the season of 1901, and at the time alleged in the writ as the date when the weir was maintained without the owner's consent, one of the wings came to within about thirty feet of the plaintiff's shore at low water; there were other fishing privileges along the eastern shore of this point and one weir, at this time, was maintained by the person in charge of the property, situated a short distance southerly of the defendant's weir. We think it evident in this case that the defendant's weir injuriously affected the rights of the plaintiff as the owner of this shore.

*Judgment for plaintiff for $50.00.*