[No. 11230. *En Banc.* October 25, 1913.]

# THE STATE OF WASHINGTON, *Appellant*, v. C. K. STURTEVANT et al., *Respondents*.[1]

NAVIGABLE WATERS—"SHORE LANDS." Irrespective of statute, and as between private parties, shore lands may be defined as lands lying between the "lines of high and low water mark;" but not when applied to state grants under the constitution and laws clearly distinguishing the term as there employed from the common law definition.

SAME — RIPARIAN RIGHTS — CONSTITUTIONAL PROVISIONS. Const., art. 17, § 1, asserting title in the state to the beds and shores of all navigable waters of the state up to the line of ordinary high water, destroyed all riparian rights in tide and shore lands and affirmed the right of the state to absolutely control and dispose of the same.

SAME—RIPARIAN RIGHTS—PURCHASE OF SHORE LANDS. Littoral and riparian rights attach to shore lands purchased from the state.

SAME—SHORE LANDS—SALE—BOUNDARIES—HARBOR LINES. Under Const., art. 15, § 1, and Rem. & Bal. Code, §§ 6744-6769, providing for the establishment of harbor lines in front of incorporated cities and for two miles on each side thereof, it has been the policy of the state to dispose of tide and shore lands of the first class up to the line of navigability, or to the inner harbor line.

SAME—SHORE LANDS—PURCHASER—RIPARIAN RIGHTS. The owner of second class shore lands has been accorded the right to extend his proprietorship up to the line of navigation, in lieu of his denied riparian rights.

SAME—SHORE LANDS—RIGHTS OF OWNER. The area between high water and the line of navigability, being theoretically nonnavigable, is treated as land and not water, its value lying in the fact that it gives access to navigable water, with the right to erect docks and piers.

PUBLIC LANDS—STATE LANDS—GRANTS—CONSTRUCTION. The rule that a grant by the state is to be construed most strongly against the grantee is controlled by the rule that such a grant, either with or without condition, must be construed to effectuate the legislative intent and avoid, if possible, unjust and absurd consequences.

NAVIGABLE WATERS—SHORE LANDS—RIGHTS OF OWNER—ACCESS TO NAVIGABLE WATER—CHANGE OF LINES—RELICTION—TITLE. Where the state grants its shore lands upon a navigable lake, the right of ac-

[1]Reported in 135 Pac. 1035.

cess to navigable water is part of the consideration of the deed, and
the state cannot, by lowering the waters in the lake, extend the line
of navigation so as to destroy the substance of the deed; but the
grant would cover all land lying between high water and navigable
water as in the case of land artificially created as a reliction.

SAME—SHORE LANDS—BOUNDARIES — HARBOR LINE — RIGHTS OF
OWNER—ACCESS. A state grant of shore lands upon a navigable lake
conveys to navigable water, subject to the right of the state to fix
a harbor line in the event that the land finally comes within the
limits of a city, making the boundary of the shore line the inner
harbor line as thereafter established, which the officers of the state
are. presumed to fix at the line of navigability, so as to give the owner
access to navigable water.

SAME—SHORE LANDS—RIGHTS OF OWNER—CONFIRMATORY STAT-
UTES—EFFECT. Laws 1913, p. 667 (3 Rem. & Bal. Code, § 8173-1 *et
seq.*), undertaking to confirm to purchasers of certain shore lands
upon a lake the title to shore lands subsequently uncovered by the
artificial lowering of the waters of the lake, excepting portions re-
served for harbor area and certain public purposes, is an acknowl-
edgment of an existing right rather than a grant of a new right;
and the rights of purchasers are to be measured by preexisting laws.

SAME—SHORE LANDS—ON LAKE TO BE LOWERED—CONVEYANCE BY
STATE—CONSTRUCTION. State deeds of shore lands on Lake Washing-
ton subsequent to the act of 1901, Rem. & Bal. Code, § 6864, granting
to the Federal government the right to lower the waters- of the lake,
will be presumed to be made in the light of that act, and with in-
tent to include all lands up to the line of navigability after the lake
had been lowered.

SAME—"TIDE LANDS" AND "SHORE LANDS"—BOUNDARIES—APPUR-
TENANCES. Under Rem. & Bal. Code, § 6641, defining "tide lands"
as all lands over which the tide ebbs and flows from the line of ordi-
nary high tide to the line of "mean low tide," and "shore lands" as
lands below the line of ordinary high water and not subject to tidal
flow, the legislature limited the outer boundary of tide lands, using
"mean low tide" advisedly; and did not attempt to limit the water
boundary to shore lands; hence the purchaser of shore lands of the
second class takes the littoral and riparian right in and appurtenant
to his land, under the general rules of law.

ADVERSE POSSESSION—HOSTILE POSSESSION—RIGHTS AGAINST STATE.
The possession of a mere squatter maintaining a float and boat-
house in front of shore lands, moored in navigable waters without
any claim of right against the state, is insufficient to initiate a title
by adverse possession or to start the running of the statute of limi-
tations.

JUDGMENT—RES JUDICATA—MATTERS CONCLUDED—IDENTITY OF IS-
SUES. Where, in an action of ejectment brought against a squatter
who had moored a boat in front of shore lands, the only issue de-
cided was that the plaintiff had no title because the property was in
navigable water and the title in the state, the judgment is not *res
judicata* in a subsequent action to recover possession of the same
property after the state had, by lowering the lake and extending the
line of navigability, added the land to the shore lands owned by the
plaintiff, and so lost its title.

COVENANTS—GENERAL OR SPECIAL WARRANTY—ACTIONS—ISSUES—
MATERIALITY. In an action to reform a deed, where it was held that
the title to land was in the grantors, it is immaterial whether the
contract called for a general warranty or for a special warranty
against the acts of the grantors and all persons claiming under them,
the latter being sufficient to pass perfect title.

PUBLIC LANDS—STATE LANDS—DEEDS—VALIDITY. Where the state
has parted with its title to lands at prices fixed by the legislature,
the courts cannot limit the effect of its deed because the prices were
inadequate in the light of subsequent conditions and the state has
need for the property.

NAVIGABLE WATERS—"SHORE LANDS"—RIPARIAN RIGHTS—RELIC-
TION. The purchaser from the state of shore lands upon a navi-
gable lake, the waters of which are proposed to be lowered by the
state, is not entitled to the possession of the new shore lands, to
be added by way of reliction, until the same have been actually
artificially created by the lowering of the lake.

Appeal from a judgment of the superior court for King
county, Dykeman, J., entered January 2, 1913, in consoli-
dated actions to quiet title, dismissing plaintiff's cause of ac-
tion and granting affirmative relief to defendants. Affirmed
in part and reversed in part.

*The Attorney General* and *R. E. Campbell, Assistant,* for
appellant.

*Farrell, Kane & Stratton* and *G. E. Steiner,* for respond-
ents Sturtevant *et al.*

*James B. Bruen,* for respondent Powell Investment Com-
pany.

*William C. Keith* (*Donworth & Todd,* of counsel), for re-
spondents Schertzer *et al.*

*Paul W. Houser, John F. Murphy, Robert H. Evans, James E. Bradford, R. S. Pierce, Preston & Thorgrimson,* and *Benton Embree, amici curiae.*

CHADWICK, J.—This action was brought by the state of Washington to recover possession of, and to quiet title to, certain submerged lands bordering the shores of Lake Washington. Other cases involving the same questions of law or affecting the property of the parties to the principal action have been consolidated with it. The purpose of the *Attorney General* in bringing this action is to obtain a decision of this court which will settle all conflicting claims of title to such lands as may come within the lawful definition of shore lands when the waters of the lake are turned into the government waterways between Lake Washington and Lake Union, and between Lake Union and Salmon Bay. The canal now in course of construction will, when completed, lower the waters of Lake Washington several feet. This will not only uncover land now submerged, but will bring within the heretofore accepted limits of shore lands land now covered by navigable water, and clearly without the boundaries of present shore lands. Whether this added area is the property of the state, to be sold or granted by it under existing or prospective laws, or whether it belongs to those who have heretofore bought the shore lands, is the question to be decided.

The respondents, who contest the right of the state to assert ownership to the added area, claim title through the Rainier Beach Improvement Company. On the 23d day of May, 1904, that company purchased certain shore lands of the state of Washington, the lands conveyed being described as follows:

"All shore lands of the second class owned by the state of Washington, situate in front of, adjacent to or upon that portion of the United States government meander line lying in front of the following described upland, to wit:

"Lots 4 and 5, section 35, township 24 north, range 4 east

of the Willamette Meridian, being 45.49 lineal chains, more or less, measured along said meander line."

When the conveyance was made, shore lands were defined by a statute to be "lands bordering on the shores of navigable lakes and rivers below the line of ordinary high water and not subject to tidal flow." Laws 1897, p. 230, § 4 (Rem. & Bal. Code, § 6641). Shore lands of the second class are defined to be all shore lands not included in the definition of shore lands of the first class. First class tide and shore lands were defined in the same statute as follows:

"Tide and shore lands of the first class, which shall comprise all tide and shore lands within or in front of the limits of any incorporated city or town, or within two miles thereof on either side, including submerged lands lying between the line of mean low tide and the inner harbor line, wherever harbor lines have been established or shall be established." Laws of 1897, p. 248, § 39; Rem. & Bal. Code, § 6744 (P. C. 477 § 117).

It is the contention of the state that the legal effect of the deed from the state to the Rainier Beach Improvement Company was a present grant of only so much land as there might be then existent and lying between the line of ordinary high water and mean low water. The trial judge held against this contention, and the state has appealed.

Much of the *Attorney General's* brief goes to a discussion of the meaning of the term "shore lands." Many authorities are cited to sustain the premise from which his reasoning flows, that shore lands are lands lying between "the lines of high and low water mark." *Maynard v. Puget Sound Nat. Bank*, 24 Wash. 455, 64 Pac. 754; *Trustees of East Hampton v. Kirk*, 68 N. Y. 459; *Doane v. Willcutt*, 5 Gray 328, 66 Am. Dec. 369; *Andrus v. Knott*, 12 Ore. 501, 8 Pac. 763; *Dunton v. Parker*, 97 Me. 461, 54 Atl. 1115.

In the absence of any qualifying statute, and as between parties asserting private rights, this definition would ordinarily be accepted. Reference to the cases relied on will show

that all of them were boundary line cases between individuals, and the judges, quite naturally, could not extend by construction the boundary line of a deed beyond the line of mean low water. But this court is not now, and has never been, put to the stress of defining the term "shore lands" as applied to state grants. The constitution and the statutes have clearly distinguished the term as there employed from the common law definition as applied to boundaries in deeds executed by individuals.

The right to control navigation is admittedly in the United States, but the people of the state of Washington have asserted "ownership to the beds and shores of all navigable waters in the state up to and including the line of . . . ordinary high water within the banks of all navigable rivers and lakes." Constitution, art. 17, § 1. This declaration destroyed all riparian right in tide and shore lands, and affirmed the right of the state to absolutely control and dispose of these lands in any way or to whomsoever the legislature might ordain.

This court has, with the exception of the case of *Burrows v. Grays Harbor Boom Co.*, 44 Wash. 630, 87 Pac. 937, uniformly held that there is no riparian right in the owner of lands bordering on the navigable waters of the state. *Eisenbach v. Hatfield*, 2 Wash. 236, 26 Pac. 539, 12 L. R. A. 632; *Brace & Hergert Mill Co. v. State*, 49 Wash. 326, 95 Pac. 278, where previous cases are collected. See, also, *Grays Harbor Boom Co. v. Lownsdale*, 54 Wash. 83, 102 Pac. 1041, 104 Pac. 267; *Hulet v. Wishkah Boom Co.*, 54 Wash. 510, 103 Pac. 814, 132 Am. St. 1127; *Lownsdale v. Grays Harbor Boom Co.*, 54 Wash. 542, 58 Pac. 663; *Gifford v. Horton*, 54 Wash. 595, 103 Pac. 988; *Palmer v. Peterson*, 56 Wash. 74, 105 Pac. 179; *Northern Pac. R. Co. v. Slade Lum. Co.*, 61 Wash. 195, 112 Pac. 240, 34 L. R. A. (N. S.) 423; *Bilger v. State*, 63 Wash. 457, 116 Pac. 19; *Austin v. Bellingham*, 69 Wash. 677, 126 Pac. 59; *State ex rel. Ham, Yearsley & Ryrie v. Superior Court*, 70 Wash. 442, 126 Pac.

945. Either through the seeming inequity of thus depriving
the owner of the upland of his riparian right, or prompted
by the selfish interest of the parties claiming such right in
the shore lands of navigable waters, depending upon the view-
point of the individual, the first legislature undertook to
compensate, in some degree, the owner for the loss of the
riparian right. A law was accordingly enacted giving a
preference right of purchase, first to the improver, and sec-
ond to the upland owner. In other words, the upland owner
was given the first right to purchase the right of access to
deep water which the state had previously cut off, that is,
the riparian right in the shore. Rem. & Bal. Code, §§ 6750,
6756, 6772 (P. C. 477 §§ 139, 289, 127). That littoral and
riparian rights attach to shore lands is recognized in
*Bilger v. State, supra,* where, after holding that the purchaser
of shore lands took title free from any claim of the upland
owner as to riparian and littoral rights, the court said:

"It follows, therefore, that such littoral and riparian rights
as the respondents have in the waters of Lake Washington
were acquired by them in virtue of the purchase of the shore
lands made by them from the state of Washington."

See, also, *Muir v. Johnson,* 49 Wash. 66, 94 Pac. 899:

"As early as the case of *Eisenbach v. Hatfield,* 2 Wash.
236, 26 Pac. 539, 12 L. R. A. 632, this court held that the
owner of uplands bordering on navigable waters as such had
no riparian or littoral rights in such waters as would enable
him to maintain an injunction from interference therewith.
This holding was based on the ground that between the
boundary of the upland and the navigable waters proper there
were shore lands which belonged to the state and to which all
riparian and littoral rights attached. . . ." *Muir v. John-
son, supra.*

Our constitution provides for the establishment of harbor
lines in front of incorporated cities and one mile on each
side thereof. Const., art. 15, § 1. This limit was extended
by the legislature to two miles. Laws 1895, p. 549; Rem.
& Bal. Code, §§ 6744-6769 *et seq.* (P. C. 477 §117).

Whether the state grant extended beyond the line of mean low water where harbor lines were established, was raised in *State ex rel. McKenzie v. Forrest*, 11 Wash. 227, 39 Pac. 684, and it was there held that the preferred purchaser took to the inner harbor line. That case proceeded upon the theory that the constitution and then existing statutes made it plain that it was the policy of the state to dispose of its tide and shore lands of the first class up to the line of navigability or up to the inner harbor line. This opinion was made the subject of a confirmatory statute. Laws 1895, p. 549, § 52; Rem. & Bal. Code, § 6744 (P. C. 477 § 117). The law provides that shore lands of the second class shall be sold not by tracts or lots and blocks, but by the lineal chain. (Rem. & Bal. Code, § 6761 [P. C. 477 § 145]); subject however, to the right of the state to thereafter fix harbor lines and harbor areas.

Since the formation of the state, the right of an owner of second class shore land to extend his proprietorship up to the line of navigation has not been questioned. It has been taken for granted as a right substituted for the lost, or rather denied, right of riparian proprietorship. The only right which the state has ever undertaken to maintain in trust for the whole people is the right of navigation. *Dawson v. Mc-Millan*, 34 Wash. 269, 75 Pac. 807. With that the state could not interfere. *Barney v. Keokuk*, 94 U. S. 324. The area lying between high water and the line of navigability, as fixed or to be fixed by the inner harbor line, being, whether submerged or not, theoretically nonnavigable, is treated as land and not water, and is wholly within the keeping of the state. The value of shore lands in most instances lies in the fact that ownership gives access to deep or navigable water. The state has sold, and the purchaser has bought, believing this to be true. The right of a riparian proprietor or a shore owner to improve up to the line of navigation and to erect docks and piers, though sometimes denied, is now well settled. 29 Cyc. 341; Farnham, Waters and Water Rights,

§ 110; *Miller v. Mendenhall*, 43 Minn. 95, 44 N. W. 1141, 19 Am. St. 219, 8 L. R. A. 89.

Now, if, in the exercise of its functions, the state sells its shore lands, we may assume that this privilege entered into, and became a part of, the consideration for its deed; so that the state could not, either by its own act or by granting the privilege to another to extend the line of navigation, destroy the substance of its deed. It is contended that, inasmuch as the deed from the state does not bound or limit the outer line of the grant, the common law definition of shore lands, to which we have referred, must be held to control, upon the theory that a grant by a sovereign state is to be construed most strongly against the grantee. *Pearl Oyster Co. v. Heuston*, 57 Wash. 533, 107 Pac. 349, 832, 135 Am. St. 1007. It is also a rule as well, if not better, established, that a grant from the government, when made either with or without consideration, is to be so construed as to effectuate the legislative intent, and avoid, if possible, unjust and absurd consequences. *United States v. Oregon & C. R. Co.*, 164 U. S. 526; *Miller v. Mendenhall, supra.*

Keeping in mind the avowed policy of the state, we may accept the narrower rule as contended for by the *Attorney General*, and still hold that the grant covers all land lying between the line of ordinary high water and navigable water. The owner of shore land takes subject to the right of the state to fix a harbor line, in the event that the land finally comes within the limits of a city or coterminous therewith. If this be done, the boundary of the shore land would be, under the statute and repeated decisions of this court, the inner harbor line. Now, theoretically, that line is already fixed. It is the line of navigability. Although not surveyed and put on paper, the officers of the state are presumed to find that line and define it when establishing the inner harbor line.

We have supplemented the diligent efforts of counsel by an independent search for apt authority, and we may fairly as-

sume that the exact question before us has not heretofore been passed upon. Nevertheless, it seems to us that this court has, in two, and possibly in three, cases, recognized as controlling what seems to us to be the governing principle in this case. In *Van Siclen v. Muir*, 46 Wash. 38, 89 Pac. 188, the shore lands had not been defined. In discussing one of the issues, it is said:

"We have not overlooked the respondent's contention to the effect that there are no shore lands on Lake Washington, and that the rules applicable to the existence of such lands do not apply. But the contention is without foundation. By virtue of the Act of Congress admitting the state into the Union, the shores and beds of all navigable rivers and lakes, up to and including the line of ordinary high water, became the property of the state; and the state, having title, can declare what portion of such lands shall constitute shore lands and be subject to sale to private parties, so long of course as its acts do not unreasonably interfere with the primary right of navigation. In the exercise of this power, the legislature has declared shore lands to be 'lands bordering on the shores of navigable lakes and rivers below the line of ordinary high water and not subject to tidal flow.' Laws 1897, p. 230, § 4. While this description is not definite where harbor lines have not been established, since it does not define the water boundary of the lands, it would certainly include all lands lying between the boundary line of the upland and low water, and may include the land lying between such boundary line and water of sufficient depth for ordinary navigation."

In *Muir v. Johnson*, 49 Wash. 66, 94 Pac. 899, the court again quotes the definition of shore lands saying:

"This description, as we said in *Van Siclen v. Muir*, 46 Wash. 38, 89 Pac. 188, is not definite where harbor lines have not been established, since it does not define the water boundary of the lands, and while we held in that case that it would certainly include all lands lying between ordinary high and low water, and might include all land lying between the upland and water of sufficient depth for ordinary navigation, the rule does not aid us here, as it appears that the boat is moored and the piles are driven below the line of low water,

but whether in water of sufficient depth for ordinary naviga-
tion the record is silent."

These cases stand as authority that the water boundary of
shore lands are not fixed by the deed of the state and must
therefore depend upon physical conditions. Inasmuch as
the harbor line stands for and includes both the line of ordi-
nary low water and the line of navigability, it would seem that,
when it is defined, the water boundary theretofore open
would be forever settled.

In the case of *Bilger v. State*, 63 Wash. 457, 116 Pac. 19,
in discussing the failure of the state to except from its deeds
its previous grant to the Federal government of the right to
lower the waters of Lake Washington, the court said:

"We need not, of course, inquire in this action what remedy
the respondents have against the state on account of its
failure to except this previously granted right to the United
States from the conveyance it made to them of the shore lands.
Whether the present normal water level marks the lake bound-
ary of these conveyances, and their remedy is for a breach of
warranty express or implied in the deed of conveyance, or
whether the state actually conveyed to them all the land lying
between the boundary of the uplands and the normal level of
the lake as it will appear when lowered . . . must be
reserved for determination in some future action where the
question is necessarily presented."

The right of these shore owners to relief is there recognized
by the court. There can be no remedy unless there be an ante-
cedent wrong. The wrong lies in taking from the shore own-
ers the rights of riparian proprietorship, or rather in extend-
ing the line of navigation after deeding the land. The deeds
were executed in virtue of the statute; there can be no im-
plied warranty, and there is no express warranty; conse-
quently the only remedy left, under the reasoning of the
court in the *Bilger* case, is to hold that the deeds of shore
owners, in form as the one before us, carry title to the line
of navigability as it may be thereafter fixed. We understand

that the inner harbor line has been fixed in front of the land in dispute with reference to the lowered waters of the lake.

If the land to be artifically created was a reliction, no question as to its ownership could arise. The state, being the owner of the shores and beds of navigable lakes, and having made a grant of the shore with the right of access to navigable water, it would seem that its legal position is not different from that of a private grantor who had made a deed under similar circumstances and to effectuate the same object.

In *Lamprey v. State*, 52 Minn. 181, 53 N. W. 1139, 38 Am. St. 541, 18 L. R. A. 670, in discussing the right of riparian proprietorship, the court held that riparian propriety rights extended to the line of navigability, saying:

"Courts and text writers sometimes give very inadequate reasons, born of a fancy or conceit, for very wise and beneficent principles of the common law; and we cannot help thinking this is somewhat so as to the right of a riparian owner to accretions and relictions in front of his land. The reasons usually given for the rule are either that it falls within the maxim, *de minimis lex non curat*, or that, because the riparian owner is liable to lose soil by the action or encroachment of the water, he should also have the benefit of any land gained by the same action. But it seems to us that the rule rests upon a much broader principle, and has a much more important purpose in view, viz. to preserve the fundamental riparian right—on which all others depend, and which often constitutes the principal value of the land—of *access to the water*.

"The incalculable mischiefs that would follow if a riparian owner is liable to be cut off from access to the water, and another owner sandwiched in between him and it, whenever the water line had been changed by accretions or relictions, are self-evident, and have been frequently animadverted on by the courts. These considerations certainly apply to riparian ownership on lakes as well as on streams. Take the case in hand, of our small inland lakes, the waters of many of which are slowly but gradually receding.

"The owners of lands bordering on them have often bought with reference to access to the water, which usually consti-

tutes an important element in the value and desirability of the land. If the rule contended for by the appellants is to prevail, it would simply open the door for prowling speculators to step in and acquire title from the state to any relictions produced in the course of time by the recession of the water, and thus deprive the owner of the original shore estate of all riparian rights, including that of access to the water. The endless litigation over the location of the original water lines, and the grievous practical injustice to the owner of the original riparian estate, that would follow, would, of themselves, be a sufficient reason for refusing to adopt any such doctrine. That the state would never derive any considerable pecuniary benefit,—certainly, none that would at all compensate for the attendant evils—we may, in the light of experience, safely assume."

What is said in *Lockwood v. New York & N. H. R. Co.*, 37 Conn. 387, is in point, if a grant of shore lands carries title up to the line of navigability. It is there said:

"If the grant had been in terms of a right of way to and from the harbor the grantees would be entitled to come to the harbor, over whatever intervening accessions of soil might accrue between high and low water mark. If the line of high water mark should be changed by natural or by artificial causes the rights of way would follow the changed line of the harbor   .   .   ."

The lowering of the waters of Lake Washington by artificial methods, and the consequent extension of the line of navigability out into the lake, was a condition that was not foreseen, and consequently not guarded against, by the legislature while the land was still a subject of state ownership. The legislature, by act of March 25, 1913, Laws 1913, p. 667 (3 Rem. & Bal. Code, § 8173-1 *et seq.*), undertook to meet this situation. The act is entitled,

"An act granting and confirming to purchasers of certain shore lands the title to shore lands, including those uncovered by the artificial lowering of the waters upon which they abut, and providing for the setting apart and donating for public services certain shore lands."

It confirms title in the owner of shore lands in the lands thus artificially made up to the "line of ordinary navigability as the same shall be found in such waters after such lowering and there is hereby granted and confirmed to every such purchaser, his heirs or assigns, all such land." It is provided that the act "shall not apply to such portions of the second class shore lands as may be reserved by the state for harbor areas, slips, docks, wharves, warehouses, streets, avenues, parkways and boulevards, alleys and other public purposes."

Both appellant and respondents find comfort in this act and rely upon it to sustain their respective contentions; but it seems to us that it is an acknowledgment of an existing right rather than a grant of a new right. The right of the present shore owners must be measured by the law as it was, and not as it may be in virtue of the act of March 25th. Whether the state has a right to make reservations for streets, alleys, boulevards, wharves and other improvements as contemplated by the act of 1913, is not passed upon by the court, but will be reserved until such time as that question is properly before us.

Those who sat in the constitutional convention, and those who met in our early legislative assemblies, were confronted with an important problem when treating the subject of tide and shore lands. Many insisted that the state should reserve title and that the land should never be sold. Others maintained that the best interests of the state demanded that they pass into private ownership, thus becoming a subject of taxation and revenue to the state. The latter theory prevailed, subject to the qualification that the harbor area should never be disposed of. The state has invited investment in these lands upon the theory that, in private ownership, all land lying back of the inner harbor line or the line of ordinary navigability would be reclaimed and put to useful purposes. To hold that the state, by artifically extending the line of navigation, can deny the right of access to deep water, would be to contradict the manifest purpose of the people and im-

pugn the legislative intent, manifested in all general laws pertaining to the subject-matter of the grant.

Furthermore, the right to lower the waters of Lake Washington was granted by the state to the Federal government in the year 1901. Laws 1901, p. 7, § 1 (Rem. & Bal. Code, § 6864; P. C. 513 § 25), and long prior to the time any deeds were executed by the state. As between individuals—and we know of no reason why the same rule should not apply as against the state—we would assume that the deeds were made in the light of the act of 1901, and with intent to include all lands up to the line of navigability as it might be determined to be after the lake had been lowered.

The *Attorney General* relies upon the case of *Pearl Oyster Co. v. Hueston,* 51 Wash. 533, 107 Pac. 349, 832, 135 Am. St. 1007, as decisive of this case and of the proposition that the title of shore lands will not be extended beyond mean low water. Respondents insist that that case is a mispronouncement of the law. We cannot agree with either side. The confusion of counsel comes from the failure to mark a difference in definition. Tide lands are defined as "all lands over which the tide ebbs and flows from the line of ordinary high tide to the line of mean low tide, except etc.;" whereas, shore lands are "lands . . . below the line of ordinary high water and not subject to tidal flow." Rem. & Bal. Code, § 6641, paragraphs 2 and 3. The words "mean low tide" must have been used advisedly. When the legislature thus limited the outer boundary of tide lands and made no attempt to limit the water boundary of shore lands, it follows, under primary rules of construction, that the purchaser of shore lands of the second class takes the littoral and riparian right in and appurtenant to his land under the general rules of law as construed by the courts and accepted by the people for hundreds of years.

"The riparian owner is . . . entitled to have his contact with the water remain intact. This is what is known as the right of access, and includes the right to erect wharves to

reach the navigable portion of the stream." 1 Farnham, Waters and Water Rights, § 62.

A possible reason for limiting the definition of tide lands to the line of mean low tide—indeed, it is most probable—was to protect the state's ownership of oyster lands, for it is well known that oyster land is generally to be found below the line of mean low tide.

We conclude, therefore, on the principal issue, that the Rainier Beach Improvement Company acquired the title to the shore lands conveyed by the state, and that it and its grantees are entitled to follow the line of navigability as it may be finally fixed by or through or in consequence of the act of its grantor, the state.

The ancestor of the Schertzers built a float and a boathouse in the navigable waters of Lake Washington in front of the shore land involved in this suit, in 1892. Afterward, they built a store building and planked over an abandoned railroad trestle for a wharf. The buildings were anchored by piling driven around the float. In later years, a boulevard was built along the shore, and the dirt from the grade of this highway lodged under one end of the store building. Schertzer claimed no right as against the state. He claimed, in the beginning, no more than a squatter's right. When Sturtevant acquired title to the upland and shore land, he brought suit against Schertzer, seeking to enjoin him from occupying the waters in front of his upland. He also brought an action in ejectment, claiming title to the land occupied by Schertzer under a deed from the state. Schertzer answered, denying the title of Sturtevant, and as a separate defense alleged that his float and improvements were in the navigable waters of Lake Washington. This case was tried before the Honorable George E. Joiner, a visiting judge. Judge Joiner filed a memorandum opinion in which he announced his intention of holding that Sturtevant could not recover because Schertzer's improvements were in navigable water. He did not pass upon the issue of title, although the effect of his finding was that the

property belonged to the state. Findings were accordingly prepared. For some reason not explained to our satisfaction, these findings were never filed nor was a judgment entered thereon. About two years thereafter, the parties stipulated as follows: "It is hereby stipulated by and between the parties hereto by their attorneys that the above entitled cause shall be dismissed without cost, the costs having already been paid by the plaintiffs." Upon this stipulation, a judgment of dismissal was signed by Judge Tallman, in form as·follows:

"Upon stipulation of the parties hereto, it appearing that the issues in the above entitled cause have been settled and defendant has been paid his costs incurred herein, it is hereby ordered that the above entitled cause be and the same hereby is dismissed without further cost to either party."

The heirs of Schertzer and his administrator were made parties to this suit. Defendant Sturtevant filed a cross bill, setting up a cause of action against Schertzer, and those claiming under him, who have plead two defenses, the statute of limitations, and that the judgment of dismissal is *res adjudicata* of the matters set up in the cross-complaint. The trial judge found in favor of the defendants Schertzers, but upon what ground is not made apparent by the record. It is clear to us that they never acquired any right or interest in the property by reason of any adverse possession. The testimony is that no claim of title or of right was made as against any one prior to the inception and assertion of Sturtevant's title to the shore lands in 1904.

The brief filed on behalf of the Schertzers indicates that the court relied upon the case of *Moore v. Brownfield,* 7 Wash. 23, 34 Pac. 199, if it based its judgment upon the defense of adverse possession. In that case, it is said: "Although possession be held in subordination to the title of the United States, it may be adverse to one claiming the land as against the possessor." Judge Sawyer so instructed the jury in the case of *Francoeur v. Newhouse,* 43 Fed. 236, which was cited as sustaining authority. So far as we know, a like

statement is not to be found elsewhere in the books.  *Moore v. Brownfield* was followed in *Johnson v. Conner*, 48 Wash. 431, 93 Pac. 914, although at the time the court had declared a contrary rule in *Yesler Estate v. Holmes*, 39 Wash. 34, 80 Pac. 851.

In *Ramsey v. Wilson*, 52 Wash. 111, 100 Pac. 177, the court refused to extend the doctrine of the *Johnson v. Conner* case.  The question came before the court again in *McNaught-Collins Land Co. v. May*, 52 Wash. 632, 101 Pac. 237, and the *Johnson* case was there overruled.  While the case of *Moore v. Brownfield* is not referred to in that decision, it was the intention of the court at that time to overrule all that part of the case of *Moore v. Brownfield* which sustained the *Johnson* case.  What constitutes possession sufficient to start the statute of limitations is sufficiently discussed in the *McNaught-Collins Land Co.* case and in the case of *Delacey v. Commercial Trust Co.*, 51 Wash. 542, 99 Pac. 574, 130 Am. St. 1112, and will not be elaborated upon in this decision. Reference to these cases will show that the defendants Schertzers have no title by adverse possession.

Neither can they rely upon the defense of *res adjudicata.* The doctrine sustaining the plea of *res judicata* has never been extended so as to hold the parties to an issue that could not have been litigated in the particular action and embraced within the judgment relied on.  We may accept the Schertzers' theory—that is, that the judgment of dismissal was entered in lieu of a formal judgment for the reason that Sturtevant had decided that he would not appeal and that it would work a saving of costs to enter a judgment of dismissal, and still the law would afford them no relief.  The only issue decided by the court was that Sturtevant had no title because the property sought to be recovered was in the navigable waters of Lake Washington.  In ejectment, it is axiomatic that a plaintiff must recover on the strength of his own title.  Accepting the judgment of dismissal as a judgment upon the merits, the real finding was that title was in

the state. The subject-matter of the present action had no legal existence, and was not subject to private ownership at that time. When the court held Schertzer's improvements were in the navigable waters of Lake Washington, it was likewise held that Schertzer had no title. Consequently the question as to which of the parties can claim the land that is to be made shore land by the lowering of the waters of Lake Washington, was never before the court and has never been decided. The Schertzers having no right by adverse possession, and having no right in virtue of the judgment relied on, it follows from what we have said in the main case that the right and title of the owner of shore land follows the line of lowering waters until it reaches the line of navigability.

The Powell Investment Company seeks to reform certain deeds made by respondent Sturtevant. It is its contention that its contract called for a deed of general warranty, whereas, the deed tendered and accepted at the time by it is a deed of special warranty in that it warrants only against doings of all persons claiming by, through or under the grantor. Having held that title is in the grantors, it follows that there is, and can be, no outstanding title, and we will not further comment on the arguments of counsel upon this issue.

The case will be remanded with instructions to enter a decree in accordance with this opinion.

CROW, C. J., FULLERTON, GOSE, PARKER, MOUNT, ELLIS, and MORRIS, JJ., concur.

ON REHEARING.

[*En Banc.* February 13, 1914.]

CHADWICK, J.—A petition for rehearing has been filed by the *Attorney General,* by the city of Seattle, the Park Board of the city of Seattle, the county of King, the town of Renton, the town of Bothell, the Commercial Waterway District No. 2, municipal corporations, and by the defendants Schertzers.

The *Attorney General* complains that we have foreclosed

the right of the state to fix an inner harbor line and create a harbor area having reference to present conditions and to thereafter lower the waters of Lake Washington. It seems to be his contention that, if this were done, the uncovered land would belong to the state and its grantee would have no remedy. It is insisted that this question was not before the court. It was our judgment when the opinion was written, and is now, that it was, in fact, of the very essence of the case, and that it was incumbent upon us to determine the legal effect of the deed made by the state to the Rainier Beach Improvement Company, in the light of present legislation and the present plan of the state to lower the waters of Lake Washington. If that were not the real question before the court, there is no excuse for this proceeding. The state might have fixed its inner harbor line before the waters were lowered, and left it to the shore owners to bring an action to determine its right so to do.

In his original brief the *Attorney General* says: "This is an action by the state of Washington . . . to recover possession of, and quiet title to certain submerged lands of Lake Washington." He says: "The lower court held that, by that deed, the state of Washington . . . conveyed all the lands lying between the line of ordinary high water and the line of ordinary navigability, and that, therefore, the respondents had title to the lands in question as against the appellant." And also, "the only question . . . that is presented by the appeal of the state is, what lands were conveyed by deed of second class shore lands, executed and delivered by the state in 1904, or what is the water or outer boundary of such grant?"

Clearly our opinion is within the bounds fixed by the state in its first brief, and well within the issues as they were found to be and decided by the trial judge.

The *Attorney General* is, also, of the opinion that we have held that the shore owner is entitled to carry his title to the line of "practical commercial navigability;" that the line of

navigable water is necessarily to be located in water of suffi-
cient depth to accommodate all shipping.   The *Attorney
General* assumes that the line of navigability is the outer har-
bor line, or government pier head line.   We have undertaken
to make it plain, all the way through the opinion, that the
line of navigability, as there used, is the inner harbor line.
We say:

"The area lying between high water and the line of navi-
gability, as fixed or to be fixed by the inner harbor line, be-
ing, whether submerged or not, theoretically nonnavigable,
is treated as land and not water, and is wholly within the
keeping of the state.   .   .   .   The owner of shore land
takes subject to the right of the state to fix a harbor line,
in the event that the land finally comes within the limits of a
city.   .   .   .   If this be done, the boundary of the shore
land would be, under the statute and repeated decisions of
this court, the inner harbor line.   Now, theoretically, that
line is already fixed.   It is the line of navigability.   Although
not surveyed and put on paper, the officers of the state are
presumed to find that line and define it when establishing the
inner harbor line.   .   .   .   Inasmuch as the harbor line
stands for and includes both the line of ordinary low water
and the line of navigability, it would seem that, when it is
defined, the water boundary theretofore open would be for-
ever settled.   .   .   .   The deeds of shore owners, in form
as the one before us, carry title to the line of navigability
as it may be thereafter fixed.   .   .   .   The state has in-
vited investment in these lands upon the theory that, in pri-
vate ownership, all land lying back of the inner harbor line or
the line of ordinary navigability would be reclaimed and put
to useful purposes."

Moreover, the act of 1913 referred to in our opinion, con-
firms title in the owner of the shore land to be artificially
made up to "the line of ordinary navigability as the same
shall be found in such waters after such lowering, etc."

Inasmuch as this court has held that harbor lines do not
necessarily have to be laid in deep water (*State ex rel. Stim-
son Mill Co. v. Board of Harbor Line Com'rs.*, 4 Wash. 6,
29 Pac. 938); and the further fact that harbor lines cannot

always be made to follow the sinuosities of the line of navigability, as that term is defined at common law, that the inner harbor line may at times be in deep water and at other times in shallow water, but wherever fixed, that which is within it is land, and that without is water, we think that there is no room for misconstruction or misunderstanding of our opinion.

The *Attorney General*, in his brief, does not refer to the act of 1913, which in itself affirms the spirit of our decision; the only question left open by it is the one reserved by us.

It is the contention of the municipal petitioning bodies that the result of our decision may be to put upon the state and its municipal agents the burden and expense of repurchasing title to some of the lands conveyed; and, for that reason, we should reconsider our decision and hold that the right of the state to insist that it has a reserve title is not foreclosed; that the title of the shore owners is in the nature of an easement, and may be reasserted under the right of *jus publicum*, such doctrine being announced in the recent case of *People v. Steeplechase Park Co.*, 143 N. Y. Supp. 503, and *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 198 N. Y. 287, 91 N. E. 846, 34 L. R. A. (N. S.) 1084; *Scranton v. Wheeler*, 179 U. S. 141; *Illinois Cent R. Co. v. Illinois*, 146 U. S. 387, and other authorities.

We think it will require no argument to convince these petitioners that this court has no right to deny the present shore owners the title which the state has given them because the state has heretofore conveyed the lands for an amount which seems inadequate, in the light of subsequent conditions. The economic questions involved have been heretofore considered and settled by the legislature. Whatever our individual opinions may be, we have no right to say, at this time, that the policy of the people of the state, as evidenced in the constitution and in the several acts of the legislature, and the titles made by the state at prices fixed by it, should be overturned by the courts, for the reason that the state

needs the property, which has become valuable in the hands of private owners.

As to the other question, the right of the state to assert a right *jus publicum* in any of the uncovered lands, this was expressly reserved, and we will meet it when it is properly submitted to us.

Counsel for the defendants Schertzers reminds us that we have not decided, as between the Sturtevants and Schertzers, the right of possession of the property in controversy between this time and the time when the waters of Lake Washington are actually lowered, saying, "The opinion . . . leaves entirely open and does not decide the right of possession of this property during the interval of time preceding the lowering of the lake." They insist that the right of possession will not pass to the cross-appellant Sturtevant until the water is actually lowered.

We agree with counsel that the right of the shore owner cannot be asserted until the waters are actually lowered, and the land thus to be artificially made comes into being, not by some legal fiction, but by the changed conditions anticipated and referred to in the act of the legislature of March 25, 1913.

The petitions for rehearing are denied.

CROW, C. J., FULLERTON, MORRIS, PARKER, ELLIS, GOSE, and MOUNT, JJ., concur.