[No. 1684.  Decided February 19, 1895.]

THE STATE OF WASHINGTON, *on the Relation of Angus McKenzie et al.*, v. W. T. FORREST, *Commissioner of Public Lands of the State of Washington.*

TIDE LANDS — AREA SUBJECT TO SALE — CONSTRUCTION OF ACT.

Under the constitution and legislation of this state, and in the light of its settled harbor policy, the term tide lands, as used in the act of March 26, 1890, when applied to tide lands of the first class, must be construed as including lands lying between such inner harbor areas as may be established and the line of ordinary high tide (or the patent line, where the same is below such high tide line).

*Original Application for Mandamus.*

*Newman & Howard*, for petitioner.

*James A. Haight*, for respondent.

The opinion of the court was delivered by

SCOTT, J.—This is an application for a writ of mandate against the respondent as commissioner of public lands, to compel him to issue a deed to the relators of lots 57 and 58 in front of the city of Fairhaven, under the act relating to the sale of tide lands. The case is submitted upon an agreed statement of facts, whereby it appears that the relators have proven every essential fact by them to be proved, and have performed every condition precedent, including a tender of the purchase price of said lots, to entitle them to purchase under their application, but that the respondent refuses to issue a deed to said lots on the ground that the same are not tide lands, and that the relators are not entitled to purchase them under the act aforesaid.

It is conceded that said lots lie between the line of ordinary low tide and the inner harbor line in front

of said city, and that they are bounded upon the easterly side by the line of ordinary low tide in the waters of Bellingham Bay in front of said incorporated city of Fairhaven, and upon the westerly side by the inner harbor line in front of said city. It is further agreed that the Whatcom county tide land appraisers' map of tide lands lying in front of said city of Fairhaven, and also such appraisers' map of tide lands lying in front of the cities of New Whatcom and Blaine, in said county, and the appraisers' map of tide lands lying in front of the several cities of other counties in this state, include, return and appraise as tide lands, the area lying between the patent line, or line of ordinary high tide, and the inner harbor line, irrespective of the location of the line of ordinary low tide; and that the area lying below the low tide line and out to the inner harbor line, where such low tide line lies between such inner harbor line and the high tide line, is included in said return and appraisement; and that pursuant to the orders of the state board of equalization and appeal, the respondent, as such commissioner, has issued certificates of purchase for portions of said last mentioned area, and many deeds have been issued by the state covering such last mentioned area; this being especially true in Whatcom county. It is also agreed that said map also shows streets crossing said last mentioned area, both at right angles to, and parallel to, the inner harbor line.

The act in question (§ 2162, Gen. Stat.) provides that the tide and shore lands in the State of Washington shall be appraised, and those which are not reserved from sale by the constitution and laws of the state shall be disposed of by the commissioner. The act (§ 2165) also provides:

"For the purpose of survey and appraisal, the tide

lands of the State of Washington are hereby divided into three classes. The first class shall embrace all tide lands situated within or in front of the corporate limits of any city, or within two miles thereof upon either side. The second class shall embrace all tide lands situated at a greater distance than two miles from either side of an incorporated city or town, and upon which are located valuable improvements. The third class shall embrace all other tide lands."

The controversy here is as to the meaning of the term "tide and shore lands" used in said act as applied to tide lands of the first class. The relators claim that the act authorizes the sale by the state of the beds of all such waters as lie between the line of ordinary high tide (or the patent line, where the same is below such high tide line) and the inner harbor line, irrespective of the location of the line of ordinary low tide.

The decisions upon this subject are few in number, and the relators cite no case where it has been held that the term "tide lands" covers any land below ordinary low tide.

Respondent insists that said act only provides for the sale by the state of such portion of the beds of such navigable waters as lie between the lines of ordinary low and high tide, and does not authorize the sale of any portion of the beds of such navigable waters as lie below the line of ordinary low tide, as the same are not included within the term "tide and shore lands."

The contention of the respondent is supported by the case of *People v. Davidson*, 30 Cal. 379, and several cases from other states following that decision. The respondent also claims that the legislature has construed the term "tide lands" to mean lands over which the tide ebbs and flows, and which are bare at low tide. Sec. 6 of an act found on page 731 of the Session Laws of 1890 does contain such definition, but it is

limited to the term as used in said act.    It further appears that in that act, notwithstanding the definition aforesaid, the term "tide lands" is used in a broader sense than is warranted by such definition.    The title of said act, and section one thereof, clearly set forth that the purpose and object of the act is to establish water ways across the tide flats, and nowhere else. Sec. 2 provides that—

"The public ways provided for in section one of this act shall not be less than fifty nor more than one thousand feet wide, and shall commence at the outer or deeper water end, in not less than twenty feet of water at low tide, and shall extend inland across the state's tide lands."

It seems that the only purpose of the definition contained in said act was to make it clear that the water way should extend up to the line of ordinary high tide.

It is not very material in this controversy, however, what the meaning of the term "tide lands" in the act referred to is, nor what is the common law meaning of such term.    The point to be determined is, in what sense the legislature used said term in the tide land act when applied to tide lands of the first class.    In construing statutes, the particular inquiry is not what is the abstract force of words or terms used, or what they may comprehend, but is in what sense they were intended to be used.    Sutherland, Stat. Const., §§ 245, 246.

From an examination of the constitution and legislation of the state it will be seen that the term "tide lands" has frequently been used in a broader sense than its literal meaning, which must be conceded to be those lands over which the tide ebbs and flows and which are bare at low tide, and that such term has been used to embrace and include the beds of navi-

gable salt waters lying below the line of ordinary low tide.

Session Laws 1890, p. 428, contains an act entitled, "An act granting to the United States, for public purposes, the use of certain tide lands belonging to the State of Washington." This act proceeds to grant to the United States tide lands so long as the United States continues to own the land adjoining such tide lands, but provides that "this grant shall not extend to or include any lands covered by more than four fathoms of water at ordinary low tide," and further that "whenever the government of the United States shall cease to hold for public purposes any such tract, piece or parcel of land, the use of the tide lands bordering thereon shall revert to the State of Washington."

The only things designated as granted by this act are tide lands, but it is provided that the same may include lands covered by not more than four fathoms of water at ordinary low tide. In this act the legislature certainly used the term "tide lands" in a sense broader than its literal meaning, and as including the beds of navigable waters below the low tide line. This act was approved March 20, 1890, six days previous to the tide land act before us.

The term "tide and shore lands" was also used in a similar sense in an act approved March 9, 1893. See Laws, 1893, p. 241, §§ 1, 2 and 9.

The constitution, art. 15, refers to the area lying between the harbor reserve and the high tide line as "intervening tide lands:"

"Sec. 3. Municipal corporations shall have the right to extend their streets over intervening tide lands to and across the area reserved as herein provided."

This space between the harbor reserve and the high tide line must be considered as "intervening tide

lands," irrespective of the location of the low tide line,· or where the low tide line intervenes between the inner harbor line and the high tide line, the right to extend streets, it would seem, must end with the low tide line, for the easement or grant is only over "tide lands," and, if tide lands end at the low tide line, streets must also end there.    It may be contended that the grant is also " to and across " the harbor reserve, and therefore the right to extend streets exists though they may in part pass over tide waters and· not tide lands.    But this court has held, in the case of the *Columbia, etc., R. R. Co. v. Seattle,* 6 Wash. 332 ( 33 Pac. 824), that by virtue of this constitutional provision, aided by the act of February 28, 1890 ( Laws, 1890, p. 733), cities may extend existing streets paralleling the harbor reserve, and if such street should be located below the low tide line and tide lands are only such as lie above low tide line, then such street does not pass over "intervening tide lands" and has no constitutional grant on which to stand, for that confers only a grant over "tide lands."    There is no good ground for believing that there was any intention to so limit the grant in the constitution.    In that case the street in controversy was for the greater portion of its length over the tide waters below the low tide line.    This court in that case, and in a number of others where tide lands were under consideration, did not confine such term to the narrow and literal meaning contended for by the respondent, and which no doubt it should receive generally where it is not affected by the context of the act, the object of its enactment or the system or plan with which it is dealing.

The constitution, art. 17, § 1, also states:

" The State of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide."

This assertion embraces a claim of title extending below the low tide line. Sec. 2 of said article, however, only disclaims title to tide, swamp and overflowed lands. The term swamp and overflowed lands is used in contradistinction to tide lands. Hence, in salt waters "tide lands" for which patents have been given are the only lands to which title is disclaimed. Therefore, if "tide lands" are only such as lie above low tide line, even though the calls of the patent extended below such line, title would not be disclaimed. But this court has held that this disclaimer of title is as broad as the claim of title in § 1, *supra*. *Scurry v. Jones*, 4 Wash. 468 (30 Pac. 726).

Again, the constitution, art 27, § 2, after continuing territorial laws in force, adds this provision:

" Provided that this section shall not be so construed as to validate any act of the legislature of Washington Territory granting shore or tide lands to any person, company, or any municipal or private corporation."

It will not be contended that if the territorial legislature had granted a portion of the beds of tide waters lying below the low tide line, that such grant is not within the scope and intent of this proviso, because it was not a grant of shore or tide lands as such term is generally construed. This court, in the case of *Eisenbach v. Hatfield*, 2 Wash. 236 (26 Pac. 539), took it for granted that this proviso, notwithstanding its language, deals only with shore and tide lands, is as broad as the claim of title to the beds and shores, etc., asserted in art. 17, § 1, *supra*.

This court also said, in the case of *Globe Mill Company*, 10 Wash. 458 (38 Pac. 1112), that the constitution, art. 15, § 3, "confers upon municipal corporations the absolute right to extend their streets over tide lands intervening between the upland and the harbor area,"

and "that the legislature, in proposing to dispose of the 'inner harbor lands,' under the provisions of the constitution in regard to harbor areas, acted on the supposition that all these tide lands are in course of time to be converted into solid lands." And if this were so, it must have meant that the same were to be extended to the inner harbor line, and not to the more or less uncertain, irregular and shifting low tide line, thereby in many instances leaving an irregular space between said low tide line and the inner harbor line, varying from a few inches to many rods, as the case might be.

The foregoing is sufficient to show that the term "tide and shore lands" has frequently been used in the constitution and laws of this state, and referred to in the decisions of this court, as capable of having a broader meaning than the one contended for by the respondent. If the term "tide lands" can be construed as broad enough to carry a grant to the United States to lands covered by not exceeding four fathoms of water at low tide, and to embrace in the disclaimer clause of the constitution land below the low water mark, and is broad enough to annul any grant of the territorial legislature of lands below low water mark, and if the term "intervening tide lands" is broad enough to permit cities to extend streets below the low tide line, certainly the term "tide and shore lands" is broad enough to include "intervening tide lands," or lands which the state owns by reason of its sovereignty, lying between high tide line and the inner harbor reserve.

Construing the act relating to the sale of tide lands in the light of the constitution and existing legislation and the peculiar harbor policy of the state, it is apparent that the term "tide and shore lands"—at least

as to tide lands of the first class — was used therein in
its generic sense as embracing those lands which the
state owns lying below high water mark, and that by
said act provision was made for the sale of all such
lands as were not expressly by the constitution and
laws of the state reserved from sale, the reservation
contemplated being the area within the harbor reserve,
streets, water ways, government grants, and such lands
as have been patented by the United States.    This act
was passed after a committee of the legislature had
personally inspected nearly every harbor in the state,
and the legislature could not have been unmindful of the
fact that the harbor reserve must in many cases be lo-
cated considerably below the line of low tide, and that
within that area many valuable improvements have
been erected and the right to purchase the ground be-
neath these was doubtless intended to be granted
thereby.    Certainly had the legislature intended to re-
serve from sale all areas lying between the low tide
line and the inner harbor line in front of incorporated
cities, it would have provided therefor in clear and ex-
press language.

There is no reason for believing the legislature in-
tended to reserve from sale an irregular, uncertain strip
lying between the low tide line and the inner harbor
line.    The contrary is clearly apparent, and such an in-
tent could only be made to appear by giving a literal
and technical construction to the words "tide and shore
lands."    This would defeat the scheme of the state in
the development and improvement of its harbors, re-
tard commercial advancement and force a condition of
affairs never contemplated by the constitution or in-
tended by the legislature.

"A construction which must necessarily occasion
great public and private mischief must never be pre-

ferred to a construction which will occasion neither, or not in so great a degree, unless the terms of the instrument absolutely require such preference." Suthland, Stat. Const., § 323.

"Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship or injustice; to favor public convenience, and to oppose all prejudice to public interests." *Id.* § 324.

The argument and contentions of the relators, which we have largely set forth herein, should be sustained, even though the term in question must receive a different and more limited meaning as to tide lands of the third class. We are of the opinion that said act as to tide lands of the first class, when construed in the light of the policy of the state with reference to its harbors, is capable of being, and should be, construed as if it had incorporated therein a proviso to the effect that as to tide lands of the first class the same should extend to the inner harbor line, and that by the establishment of harbor reserves the line of low tide is arbitrarily fixed as coincident with the inner harbor line, and that all lands lying within such inner harbor line and the high tide line were fairly designated as intervening tide lands. This contention will harmonize said act with the constitution and will be consonant with the policy of the state as to. preserving and improving its harbors ( § 2125 *et seq.*, Gen. Stat.), and will establish an orderly and uniform plan and system of dealing with these lands; and the other construction would create infinite confusion and disorder.

We are of the opinion that the writ should issue.

Hoyt, C. J., and Anders and Gordon, JJ., concur.