[No. 8434.  Department One.  March 2, 1910.]

PEARL OYSTER COMPANY *et al.*, *Respondents*, v. MYRON T. HEUSTON *et al.*, *Appellants*.[1]

PUBLIC LANDS — TIDE LANDS — DEFINITION — BOUNDARIES.  Tide lands, proper, are those lying between the lines of ordinary high tide and mean low tide, the law accepting the mean and not the extreme where boundaries are concerned.

SAME—STATUTES—CONSTRUCTION.  There is no conflict between Rem. & Bal. Code, § 6641, defining tide lands and § 6744 dividing all tide lands into two classes with reference to the location of the boundaries of cities and towns.

PUBLIC LANDS—TIDE LANDS—STATE DEED—CONSTRUCTION.  A state deed of all tide lands situate in front of, adjacent to, or abutting, upon, certain portions of the government meander line particularly described, extends only to the line of mean low tide, under Rem. & Bal. Code, § 6641, defining tide lands as those over which the tide ebbs and flows from the line of ordinary high tide to the line of mean low tide; especially as a grant by a state is to be construed most strongly against the grantee, and restricted to the narrowest limits that will reasonably satisfy the grant if no limit is fixed by the deed.

PUBLIC LANDS—OYSTER LANDS—SALE—APPLICATION—INTEREST OF OBJECTORS.  The grantee of tide lands extending only to mean low tide has no interest entitling him to object to a state sale of oyster lands lying below the line of mean low tide; since only the state can question the right of another to purchase such lands.

Appeal from a judgment of the superior court for Skagit county, Joiner, J., entered August 9, 1909, reversing, on appeal, a decision of the board of state land commissioners

[1] Reported in 107 Pac. 349, 832.

in which the board granted an application to purchase oyster lands. Reversed.

*The Attorney General* and *T. W. Hammond*, for appellants.

*Troy & Sturdevant* and *Hadley, Hadley & Abbott*, for respondents.

RUDKIN, C. J.—On the 24th day of October, 1907, Myron T. Heuston, J. S. Ferguson, Louise Heuston, Ida Peters, M. A. Riley, Herman Martin, and Edward F. Fay, filed in the office of the commissioner of public lands of this state their several applications to purchase certain tide lands of the second class in Skagit county, as oyster lands. Notice of the applications was published as prescribed by law, and within the time limited by law, the Lake Whatcom Logging Company, the Pearl Oyster Company, the Oyster Creek Oyster Company, and one J. J. Cryderman protested against the allowance of the applications, claiming that the tide lands applied for had theretofore been conveyed by the state to Cryderman and others. A hearing was thereafter had on the applications and the protests, before the board of state land commissioners. The board found that the lands applied for were below the line of mean low tide, and granted the applications. From this order an appeal was taken to the superior court of Skagit county, and from the judgment of that court, reversing the order or decision of the board of state land commissioners, the present appeal is prosecuted.

Prior to the filing of the applications to purchase the oyster lands, the state had conveyed to Cryderman and others all tide lands of the second class owned by the state situate in front of, adjacent to, or abutting upon certain portions of the government meander line particularly described in the state deeds. The lands applied for by the appellants are situate in front of and adjacent to the meander line thus described, but below the line of mean low tide. On the foregoing facts the appellants contend that the lands below mean

low tide are subject to sale as oyster lands, while the respondents contend that such lands are included within their deeds; but, if not so included, are not subject to sale as oyster lands or otherwise. The case thus presented calls for a consideration and construction of the laws of this state relating to the classification and sale of tide lands.

In the absence of legislative definition or judicial decision, one's first conception of tide lands would be the body of land covered and uncovered by the flow and ebb of the ordinary tides. Lands above the line of high tide are not tide lands, nor are lands entirely submerged or covered by water. When a stream or other body of water forms a boundary line, whether the boundary be high or low water mark, the law accepts the mean and not the extreme, so that tide lands proper lie between the lines of ordinary high tide and mean low tide. This has been the judicial construction of the term tide lands. *People v. Davidson*, 30 Cal. 379; *Andrus v. Knott*, 12 Ore. 501, 8 Pac. 763; *Walker v. State Harbor Comr's*, 17 Wall. 648. Such also was the view of this court in the case of the *State ex rel. McKenzie v. Forrest*, 11 Wash. 227, 39 Pac. 684, which will be referred to later in this opinion.

The first act of the state legislature, relating to the subject of tide lands, was the act of March 26, 1890, Laws of 1889-90, p. 431. Section 4 of the act classified tide lands with reference to their location and condition, but did not attempt to otherwise describe or define them. That duty devolved upon this court in a measure in the case of *State ex rel. McKenzie v. Forrest, supra*. It was there held that tide lands of the first class extended beyond or below the line of mean high tide to the inner harbor line. This was admittedly a forced construction of the tide land act to avoid the public inconvenience and mischievous consequences that would result from leaving "an irregular uncertain strip lying between the low tide line and the inner harbor line." This

is apparent from the opinion in the case and especially the closing paragraph, which reads as follows:

"The argument and contentions of the relators, which we have largely set forth herein, should be sustained, even though the term in question must receive a different and more limited meaning as to tide lands of the third class. We are of the opinion that said act as to tide lands of the first class, when construed in the light of the policy of the state with reference to its harbors, is capable of being, and should be, construed as if it had incorporated therein a proviso to the effect that as to tide lands of the first class the same should extend to the inner harbor line, and that by the establishment of harbor reserves *the line of low tide* is arbitrarily fixed as coincident with the inner harbor line, and that all lands lying within such inner harbor line and the high tide line were fairly designated as intervening tide lands. This contention will harmonize said act with the constitution and will be consonant with the policy of the state as to preserving and improving its harbors . . . . and will establish an orderly and uniform plan and system of dealing with these lands; and the other construction would create infinite confusion and disorder."

That case was decided February 19, 1895, and within less than a month thereafter the legislature passed the act of March 26, 1895, Laws of 1895, p. 527, section one of which defined tide lands in almost the exact language of this court. That section reads as follows:

"That for the purpose of this act all lands belonging to and under the control of the state shall be divided into the following classes: . . . (2) Tide lands: All lands over which the tide ebbs and flows from the line of ordinary high tide to the line of mean low tide, except in front of cities where harbor lines have been established or may hereafter be established, where such tide lands shall be those lying between the line of ordinary high tide and the inner harbor line, and excepting oyster lands." Rem. & Bal. Code, § 6641.

The above section was reenacted as section four of the act of March 19, 1897, Laws of 1897, p. 230, under which the tide lands claimed by the respondents were sold and conveyed. If the deeds under which the respondents claim are limited

and confined to tide lands as thus defined, it seems too plain
to admit of argument or discussion that nothing passed by
the deeds beyond the line of mean low tide. The respondents
contend, however, that when section four is construed in con-
nection with section thirty-nine of the same act, it becomes
apparent that the legislature intended to make plenary pro-
vision for the sale and disposal of all of its tide lands, whether
above or below mean low tide.

Section thirty-nine reads as follows:

"The tide and shore lands of the state of Washington,
which are not reserved from sale by the constitution and laws
of the state, shall be divided into two classes:

"(1) Tide and shore lands of the first class, which shall
comprise all tide and shore lands within or in front of the
limits of any incorporated city or town, or within two miles
thereof on either side, including submerged lands lying be-
tween the line of mean low tide and the inner harbor line,
wherever harbor lines have been established or shall be es-
tablished.

"(2) All tide and shore lands in the state not included in
the above class shall be known as second class tide and shore
lands, and shall be leased and sold as in the manner provided
in this act." Rem. & Bal. Code, § 6744.

We see no conflict between these two sections. The first
defines tide and shore lands, while the second provides for
their sale and lease. Tide lands within the purview of section
thirty-nine are the tide lands defined in section four. Indeed,
if section four did not exist at all the same conclusion would
follow, for as already stated submerged lands below the line
of mean low tide are not, strictly speaking, tide lands at all.
Other provisions of the different tide land acts lead to the
same conclusion. Under the act of 1890, tide lands were
described by metes and bounds, so that state deeds specifically
described the lands conveyed; while under the act of 1897,
such lands are only described by reference to the government
meander line. Under the latter act the boundary on the
water side is not fixed at all, unless fixed at the line of mean
low tide as defined by section four. If the tide lands claimed

by the respondents are not bounded or limited by the line of mean low tide, we are at a loss to know where the true boundary is. Is it the line of extreme low tide, the middle of the sound, mid-ocean, or the opposite shore? If it required a forced construction of the statute and a legislative decree to extend tide lands of the first class to the inner harbor line, to what point does the respondents' title extend, under a fair and reasonable construction of the law?

Again, every grant by a sovereign state is construed most strongly against the grantee. Nothing passes by intendment or implication. And if the law or the state deed fixes no limit to a grant, it becomes the duty of the courts to fix the narrowest limit that will reasonably satisfy the terms of the grant. For these reasons we have no hesitation in saying that the tide land grant to the respondents and their predecessors in interest did not extend beyond the line of mean low tide. We are told such a construction of the law at this time will disturb titles and work irreparable injury to the purchasers of tide lands, but with that question the courts have little or no concern. We find nothing in the legislation of this state to give color to the respondents' present claim. Nor is the claim supported by any prior decision of this court. We have already referred to the case of the *State ex rel. Mc-Kenzie v. Forrest, supra,* and the question now presented was not involved in the later case of *Welsh v. Callvert,* 34 Wash. 250, 75 Pac. 871. In that case the relator attempted to purchase tide lands above the line of mean low tide which were confessedly included in the respondents' deeds, on the ground that the tide land deeds did not include oyster lands. This court held that the character of the land was determined by the proper officer of state before the deed issued, and that the state deed could not be collaterally attacked. No question as to the limits of the respondents' grant was before the court or referred to in the opinion. All parties to the controversy conceded that the lands applied for were within the grant to the respondents and such was manifestly the case.

No other decision of this court has been cited, and we are not advised that the administrative officers of the state have placed a different construction on the law. Indeed, we cannot readily see how such officers could be called upon to construe this branch of the law at all, for the state deed simply described the tide lands by reference to the meander line, and their limits and boundaries in other respects are fixed by operation of law, and not by any act of the department. If, therefore, the respondents and others have been misled, or have placed a different construction on the law, it is perhaps because it was to their interest to be misled or to construe the law to their own advantage.

It is lastly contended that if the lands in controversy are not included in respondents' deeds, because not tide lands of the second class, they are for the like reason not subject to sale as oyster lands. We do not feel called upon to decide that question at this time. If the respondents have no interest in or claim to the lands, they have no standing before the board of state land commissioners, or on appeal to the courts. The question is solely one between the state and the appellants with which we are not at present concerned.

The cases were all submitted to the court below under a stipulation, reserving certain questions for trial and decision in the event the court should rule that the lands applied for were not included in the deeds under which the respondents claim. To the end that this stipulation may be given effect, the judgment is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

CHADWICK, FULLERTON, GOSE, and MORRIS, JJ., concur.

### ON PETITION FOR REHEARING.
[Decided March 29, 1909.]

PER CURIAM.—In the opinion heretofore filed we held that the respondents had no title to the tide lands claimed by them lying below the line of mean low tide, and declined to pass upon the right of the appellants to purchase such tide lands

as oyster lands. It is earnestly insisted, in a petition for rehearing, that the latter question was properly before the court and should have been decided. The failure of the court to decide the question thus presented was not an oversight, but a decision of it would or might affect the rights of parties not before the court who have obtained patents from the state, and it would be an injustice to them to decide a question of such magnitude at the instance of parties who are at best only trespassers on state property. The rehearing is therefore denied.