[No. 12526.   Department Two.   January 5, 1916.]

THE STATE OF WASHINGTON, *Appellant*, v. J. H. SCOTT
et al., *Respondents*.[1]

NAVIGABLE WATERS—LANDS UNDER WATERS—"TIDE LANDS"—DEEDS
—LAND CONVEYED. Under the act of 1897, 2 Rem. & Bal. Code, § 6641,
defining tide lands as all lands over which the tide ebbs and flows
from the line of ordinary high tide to the line of mean low tide, ex-
cepting oyster lands, a state deed of tide lands conveys title only
to the line of mean low tide; as the deed is limited by ·the express
terms of the statute.

SAME. Such deed did not convey any title to oyster lands, there-
tofore deeded by the state for oystering purposes under the pro-
visions of the Callow act, Rem. & Bal. Code, §§ 6806 and 6807.

SAME — TIDE LANDS — DEEDS — "FRONTING" OR "ADJOINING" TIDE
LANDS. Under the act of 1911, 3 Rem. & Bal. Code, § 6641, defining
tide lands as all lands over which the tide ebbs and flows from the
line of ordinary high tide to the line of extreme low tide, excepting
oyster reserves and lands in front of certain cities, which act ex-
tended tide lands which theretofore stopped at mean low tide, a
state deed of tide lands in front of described upland tracts carries
title to all tide lands to the line of extreme low tide, save those ex-
cepted; hence, it includes tide lands in front of the upland lots be-
yond intervening oyster lands sold to oyster growers, although it is
not "adjoining" the lots by reason of the intervening oyster lands.

[1]Reported in 154 Pac. 165.

SAME—TIDE LANDS—PREFERENCE RIGHT TO PURCHASE—"OWNERS OF SECOND-CLASS TIDE LANDS"—STATUTES. Grantees of state tide lands for oystering purposes, in deeds issued under the provisions of the Callow act, Rem. & Bal. Code, §§ 6806 and 6807, do not take fee simple title and are not owners of tide lands "theretofore sold or conveyed," within the meaning of the act of 1911, 3 Rem. & Bal. Code, § 6641-1, which granted to owners of second-class tide lands "heretofore sold or conveyed" the preference right for ninety days to purchase all tide lands to the line of mean low tide in front of second-class tide lands theretofore sold; a fee simple title being essential to such preference right.

SAME—"TIDE LANDS"—LANDS INCLUDED—STATUTES—CONSTRUCTION. In view of the Callow act, Rem. & Bal. Code, §§ 6808 to 6818, passed for the encouragement and protection of deep-sea oyster culture and making provision for the leasing of lands lying below the line of extreme low tide for deep-sea oyster planting, at a time when the act defining tide lands limited the same to the line of mean.low tide and excepted oyster lands, the act of 1911, 3 Rem. & Bal. Code, § 6641-1, redefining tide lands so as to extend the same to the line of extreme low tide, excepting "oyster reserves," must be construed as intending to adopt, as the line of extreme low tide, the line separating tide lands from land so continuously covered with water that it might be leased for deep-sea oyster culture; in view of the policy of the state to encourage such culture and especially where the question arises in the construction of a state deed of tide lands, which is to be construed, in case of doubt, most strongly against the grantee.

SAME—"TIDE LANDS"—"MEAN LOW TIDE" AND "MEAN LOWER LOW TIDE." On Puget Sound, where there are two high and two low tides each day, the alternate high and low being unequal; "mean low tide" signifies the average level of the low tides including both the long and short run out; while "mean lower low tide" signifies the mean level of the daily extreme low tides.

SAME—TIDE LANDS — DEEDS — LANDS INCLUDED — "EXTREME LOW TIDE"—EVIDENCE—SUFFICIENCY. The evidence is insufficient to sustain findings that lands in front of abutting uplands, known as the "pothole," and the bed of the channel leading thereto, were above "extreme low tide," where it appeared from soundings taken by an engineer, upon a proper plan, during short periods in July and the following January, that the bottom of the pothole was from one to seven feet lower than the arbitrary plane adopted by the United States Geodetic Survey and the Department of Commerce as the lowest plane of tide in Puget Sound recognized by that department and on which its tide tables and charts are based, and the engineer criticising such soundings (because not taken over a sufficiently long period of time) admitted that the bottom of the pothole was about

a foot below extreme low tide and the channel a foot above; especially where witnesses living in the vicinity for a great many years testified that the lowest tides always left from one to two feet of water in the pothole proper and from four to six inches in the channel, leaving nothing exposed save insignificant portions around the border; hence the title to the pothole and channel did not pass under a state deed of all tide lands "in front" of the abutting upland, limited by statute to the line of "extreme low tide."

ADVERSE POSSESSION—COLOR OF TITLE. A deed of state tide lands, limited to extreme low tide, is not color of title to lands beyond the line of extreme low tide, so as to confer title by adverse possession and the payment of taxes for seven years under color of title in good faith.

SAME—AGAINST STATE. Where there is no element of estoppel against the state's assertion of title to state tide lands adversely occupied, adverse possession does not run against the state.

Appeal from a judgment of the superior court for Thurston county, Claypool, J., entered July 27, 1914, upon findings in favor of the defendants, dismissing an action to quiet title, and for an injunction, tried to the court. Reversed.

*The Attorney General* and *R. E. Campbell, Assistant* (*L. L. Thompson,* of counsel), for appellant.

*Gordon & Easterday,* for respondents.

ELLIS, J.—This is an action by the state of Washington to recover possession of, and quiet title to, a portion of the bed of Puget Sound, commonly known and referred to in the record as the "pothole," and to enjoin the defendants from trespassing thereon. The defendants admit that the state, upon its admission into the Union, acquired title to the pothole by virtue of § 1, art. 17 of the state constitution, whereby the state asserted title to the beds and shores of all navigable waters within its boundaries. They contend, however, that the state conveyed the pothole to them by certain deeds of second-class tide lands, which are pleaded in their answer. The state admits the issuance of the deeds, but denies that they conveyed the pothole or any part of it. The evidence

3—89 WASH.

shows beyond question that the pothole and the channel leading out of it to deep water lie below the line of mean low tide. Between the pothole and the strip of tide lands lying in front of and contiguous to government lots 3 and 4, are situate certain tide land tracts or oyster claims forming a continuous chain, deeded to Jim Simmons, J. A. Gale and J. H. Tobin for oystering purposes. These oyster claims were deeded under the provisions of chapter 25, pp. 39, 40, Laws of 1895, Rem. & Bal. Code, §§ 6806 and 6807 (P. C. 373 §§ 39, 41), commonly known as the Callow act. We shall hereinafter refer to them as the Callow claims. The deeds upon which the defendants rely as conveying to them the pothole are:

*First,* a deed from the state dated March 18, 1911, conveying to the defendant J. H. Scott "all of the tide lands undisposed of by the state, situate in front of, adjacent to and abutting upon lot 3, section 22, township 19 north, range 3 west." *Second,* a deed from the state dated June 18, 1901, conveying to the defendant J. H. Scott "all that portion of the tide lands of the second-class owned by the state of Washington, situate in front of, adjacent to and abutting upon lot 4, section 22, township 19 north, range 3 west." *Third,* a deed from the state dated June 6, 1911, to both defendants, conveying:

"All tide lands of the second class, owned by the state of Washington, lying between the line of mean low tide and the line of extreme low tide and in front of lots one, two, three and four, section twenty-two, township nineteen north, range three west, W. M., with a total frontage of 81.81 lineal chains, more or less, measured along the meander line, according to a certified copy of the government field notes of the survey thereof on file in the office of the commissioner of public lands at Olympia, Washington.

"Excepting such portions of said tide lands as are included in state oyster reserves, and subject to such right, title or interest as may have been acquired by the purchaser of any part of said lands as tide lands suitable for the

cultivation of oysters under any deed or contract heretofore issued by the state of Washington."

Much testimony was introduced of experts from observations taken at the pothole and as to general tide conditions on Puget Sound, and testimony of witnesses long acquainted with the pothole as to whether it has ever been entirely uncovered at the lowest tides, all with the view of determining whether in fact the pothole lies below the plane of extreme low tide.

The court found, in substance, the situation of the land as we have outlined it, and that the defendants had, at all times since July, 1900, been in open, notorious, exclusive and peaceable possession of the pothole, paying all taxes thereon since that time; that the land described as the pothole lies above the line of extreme low tide; that the state of Washington does not now, and did not when this action was commenced, own the pothole or any portion thereof, and that it had failed to establish the material allegations of its complaint. Upon these findings and appropriate conclusions of law, the court entered a decree denying to the plaintiff the relief prayed for, and dismissing the action. The plaintiff appeals.

The appellant contends (1) that the deeds upon which the respondents rely conveyed no title to the pothole, in that the pothole is not in front of and adjoining the upland or any tide lands of the second-class owned by the defendants in front of and adjoining the upland; (2) that the defendants acquired no title to the pothole by any of these deeds because the evidence shows that the pothole is below the line or plane of extreme low tide. The first of these contentions presents a question of law; the second, a question of fact.

I. ·At the time that the first two deeds were initiated by purchase of the tide lands therein described, tide lands were defined by statute as follows:

"*Tide Lands:* All lands over which the tide ebbs and flows from the line of ordinary high tide to the line of mean

low tide . . . and excepting oyster lands." Laws of 1897, ch. 89, p. 230, § 4; 2 Rem. & Bal. Code, § 6641.

See, also, *Pearl Oyster Co. v. Heuston,* 57 Wash. 533, 107 Pac. 349, 832, 135 Am. St. 1007.

The first deed, though issued on March 18, 1911, was made in pursuance of a purchase by George C. Israel from the state on July 7, 1900, long before the act of 1911, to which we shall hereinafter refer, had extended the outer line of the state's tide lands to the line of extreme low tide. It is clear, therefore, that this deed conveyed only what Israel had purchased, and carried title no further than to the line of mean low tide.

The second deed, of June 18, 1901, likewise carried title only to the line of mean low tide. It was made in pursuance of a purchase long antedating, and itself long antedated, the extension act of 1911. These two deeds are limited by the express terms of the statute defining tide lands, then in force, to lands above the line of mean low tide, and excepting oyster lands. *Pearl. Oyster Co. v. Heuston, supra.* They did not convey any of the lands theretofore deeded under the Callow act. This court specifically so held in *Scott v. Olympia Oyster Co.,* 63 Wash. 364, 115 Pac. 737.

At the time the third deed above referred to was issued, the outer line of the state's tide lands had been extended. Tide lands were then defined by statute as follows:

"*Tide Lands:* All lands over which the tide ebbs and flows from the line of ordinary high tide to the line of extreme low tide, except in front of cities where harbor lines have been established or may hereafter be established, where such tide lands shall be those lying between the line of ordinary high tide and the inner harbor line and excepting oyster reserves." Laws of 1911, p. 130, ch. 36, § 1, subd. 2; 3 Rem. & Bal. Code, § 6641.

It is obvious that, but for the exception of lands theretofore deeded, the description in the third deed would have carried title to the line of extreme low tide, wherever that

may be. It is equally obvious, as it seems to us, that with the
exception, it carries title to all of the tide lands to the line
of extreme low tide, *save those excepted.* The appellant con-
tends, however, that this deed, when construed in accordance
with the law of 1911, pursuant to which it was made, con-
veyed nothing beyond the intervening Callow grants. The
purchase was under the preference right accorded by § 2 of
the act of 1911, which provides:

"The prior and preference right to purchase all tide lands
of the second class lying between the line of mean low tide
and the line of extreme low tide in front of all tide lands of
the second class heretofore sold or conveyed by the state of
Washington is hereby granted for the period of ninety days
from the date this act goes into effect to the purchasers, their
grantees or successors in interest of any tide lands of the
second class heretofore sold or conveyed by the state of Wash-
ington. . . ." Laws of 1911, p. 130, ch. 36, § 2; 3 Rem.
& Bal. Code, § 6641-1.

Appellant insists that the words "in front of" contained in
this section, mean "adjoining," quoting in support of that
claim from *State ex rel. Lehman v. Bridges,* 24 Wash. 363,
64 Pac. 518, where it is said:

"From a geometrical point of view 'in front of' might in-
clude everything between the prescribed line and infinity;
but, as applied practically to measurements on the surface of
the earth, we believe it can only mean immediately in front
of,—that is, adjoining."

It is argued that, under that decision, the third deed above
mentioned did not convey to the respondents any lands out-
side of the Callow claims, in that lands outside of those claims
lay *in front of,* that is, *adjoining* the Callow claims, and not
in front of or adjoining the tide lands of the respondents ly-
ing between the upland and the Callow claims. Construed in
relation to its facts, the *Lehman* case does not sustain the
appellant's contention. That case merely holds that lands
"in front of" the limits of an incorporated city or town in-
cluded only such lands as were adjoining and in front of such

city or town on the same side of the channel of navigable
water, and that the term was not used in the absolute or geo-
graphical sense which would include all tide lands lying be-
tween the side lines of the city extended to infinity so as to
embrace tide lands on the other side of the channel. Though
it defines the words "in front of" as meaning "immediately in
front of—that is, adjoining," this definition is plainly in-
tended as a conclusion from what precedes it. So read, it is
clearly meant to apply to the whole body of tide lands on the
given side of the channel without regard to segregated owner-
ship, that is, all lands in front of and adjoining in the sense
of lying on that side of the channel.

We cannot adopt the view of the *Attorney General* that
the Callow act claimants are owners of tide lands "thereto-
fore sold and conveyed," within the meaning of the act of
1911, so as to be entitled to the preference right to purchase
the tide lands in front of those claims lying between the lines
of mean low tide and extreme low tide under that act. Though
they had such a right as prevented their claims from pass-
ing by the state's tide land deed, and such in fact that the
state could not convey their land at all without first declaring
a forfeiture of their claims for cause, they did not hold
the fee simple title. *Scott v. Olympia Oyster Co., supra.*
On principle it would seem that nothing short of a fee simple
title could be a sufficient basis for the preference right to pur-
chase in fee simple the frontal tide lands between mean low
and extreme low tide. The case of *Bleakley v. Lake Wash-
ington Mill Co.,* 65 Wash. 215, 118 Pac. 5, cited by appel-
lant in this connection, goes no further than to hold that
land located below the line of high water and above the me-
ander line on the shore of Lake Washington, and hence sub-
ject to overflow, when patented by the government prior to
statehood and thereafter owned as private property, is not
"shore land" within the meaning of the statute, but is to be
regarded as upland by force of the government's survey and
patent in fee, the ownership of which carries the preference

right to purchase unpatented shore lands belonging to the state and fronting or abutting upon the patented land; the patented land, though actually overflow land, being by legal convention upland, carried as an incident the preference right of purchase to its owner in fee simple.

We fail to see wherein the case of *State v. Sturtevant*, 76 Wash. 158, 135 Pac. 1035, 138 Pac. 650, also cited by appellant, when confined to its facts, has any bearing on the question before us. That case involved accretions or relictions resulting from the lowering of the waters of Lake Washington, inuring to the abutting owner with an undefined water boundary. As indicated in that case, there is a marked difference in the definition of shore lands and tide lands found in Rem. & Bal. Code, § 6641, as to their outer boundaries, the outer boundary of shore lands being left undefined, while the outer boundary of tide lands was defined first as extending to mean low tide and subsequently, by the act of 1911, to extreme low tide.

II. Impelled, as we are, both by the terms of the third deed and by the statute under which it was made, to hold that it conveyed all tide lands between the lines of mean low tide and extreme low tide in front of those conveyed by the two prior deeds to the respondents, the issue is reduced to the evidential question, is the pothole below the line or plane of extreme low tide? If it is, the third deed did not convey it to the respondents and the title still remains in the state. If it is not, that deed did convey it to the respondents.

Preliminary to a determination of that question, a brief resume of the state's pertinent tide land legislation will be illuminating as to what was intended by the use of the term "extreme low tide" in the statute, ch. 36, Laws of 1911, p. 130 (3 Rem. & Bal. Code, § 6641-1 *et seq.*). The first act relating to the disposition of tide lands, Laws of 1889-90, p. 431, prescribed no outer boundary for the state's tide lands. They were sold by metes and bounds fixed by surveys made by the applicant in each case. The resulting irregularity of

privately owned tracts led to the passage of the act of 1895, Laws 1895, p. 527; 2 Rem. & Bal. Code, § 6641, *supra,* defining tide lands and adopting the line of *mean low tide* as their outer boundary. Thereafter this court in *Pearl Oyster Co. v. Heuston, supra,* held that state deeds of tide lands conveyed nothing between the lines of *mean low tide* and *extreme low tide.* This in turn led to the passage of the act of 1911, amending the definition of tide lands by extending the outer line to the line of *extreme low tide.* The original definition of 1895 and as reenacted in 1897 excepted "oyster lands," and the amended definition of 1911 excepted "oyster reserves." By an act of 1899, Laws 1899, p. 272, ch. 136; Rem. & Bal. Code, §§ 6808 to 6818, inclusive, passed for the encouragement and protection of deep-water oyster culture, provision had already been made for the leasing of lands lying below the line of extreme low tide for deep-sea oyster planting.

With this act and the prior definition before it, we must assume that the legislature, in using the term "extreme low tide," in redefining tide lands in the act of 1911, meant to extend the boundary of its tide lands out to the line separating land so continuously covered with water that it might be leased for deep-sea oyster culture from the tide lands of the state. This, as it seems to us, furnishes a practical definition of the term "extreme low tide" as a boundary, and in view of the exception of oyster lands in both definitions of tide lands and of the settled policy of the state to encourage oyster culture, evidenced by the act of 1899, furnishes an impelling reason, where the question whether a given tract lies below or above that line is one of extreme doubt, for resolving the doubt in favor of the state. This view accords also with the rule that grants by a sovereign state are to be construed most strongly against the grantee, which rule is as applicable to tide land grants as to any other. *Pearl Oyster Co. v. Heuston, supra.* Indeed, it would seem that this rule should

be especially applicable where, as here, its observance tends to subserve a settled policy of the state.

A detailed review of the evidence is incompatible with the reasonable compass of an opinion. It is largely technical. We shall attempt no more than to indicate its nature and tendency.

The state sought to show that the pothole lies below the lowest recognized plane of extreme low tide. On Puget Sound there are two high and two low tides occurring in approximately each twenty-four hours. The alternate high and low tides are unequal. There is an extreme daily low tide and an extreme daily high tide. The term *mean low tide* signifies the mean or average level of the low tides, including both the long and the short daily runout. *Mean lower low tide* signifies the mean level of the daily extreme low tides. The *harmonic plane* is the zero adopted by the United States Coast and Geodetic Survey and the Department of Commerce, upon which its tidal tables, charts and maps are based. It is an arbitrary plane and is the lowest plane of the tide in Puget Sound recognized by that department. It is approximately two feet lower than mean lower low tide and approximately four feet lower than mean low tide. The plane of extreme low tide, as established by the United States army engineers through some twenty years of observations at Seattle, is approximately two feet lower than the harmonic plane. The state sought to show that the pothole lies below this plane as fixed by the army engineers.

Edward Dohm, the field engineer of the state's land department, took soundings at the pothole in order to determine its relation to the plane of extreme low tide. The following method was pursued: In July, 1913, he set a gauge on a pile near the mouth and at the east end of the pothole and another at the west end, and took a series of readings covering two days in July and ten days in the following January. From these readings, and from others taken at the same time at Seattle by the United States Coast and Geodetic

Survey, he determined the difference in elevation between his gauge at the pothole and those at Seattle, and taking the average of these differences, adjusted his gauges to the same level as that at Seattle. He found that his gauges at the pothole were set .05 too low. In taking the soundings in the pothole and in the preparation of the map of the pothole showing his soundings, which is in evidence, due allowance was made for this discrepancy, and also for the change of tides during the time of taking the soundings. One man was located at the gauge recording the height of the water, and another man in a boat was at the same time recording the depth of the water at each sounding. The bottom of the pothole and the channel as compared with the line of extreme low tide at the pothole, as determined by the soundings and readings taken by the witness, adopting the line of extreme low tide as shown by the records of the army engineers and indicated upon the map made by the witness, is from one to seven feet below that plane.

The respondents sought to meet this evidence with the testimony of J. L. Clapp, a civil engineer formerly connected with the United States Engineer's Office at Seattle, who testified, in substance, that, in order to determine the depth of water below the plane of extreme low tide, he would have followed the same course as that pursued by Dohm, but that Dohm's deductions were unreliable because his observations did not extend over a sufficient length of time. He testified that, to be accurate, it would be necessary to take a great number of readings over a long period of time. He also testified that, calculating from maps prepared by the United States Coast and Geodetic Survey, the bottom of the pothole is about a foot below the line of extreme low tide, and the bottom of the channel leading out of the pothole is about a foot above the line of extreme low tide. It is thus apparent that the real controverted point in evidence is as to the depth of the channel, since the respondents' own evidence concedes

that the pothole proper lies a foot below the plane of extreme low tide as fixed by the government engineers.

With due deference to the opinion of the learned trial court, we believe that greater weight should be given to the testimony of the witness Dohm, which is based upon actual measurements, though covering only a short period of time, but admittedly made upon a proper plan, than to estimates of the respondents' witness Clapp. But even conceding that the testimony of these witnesses might be considered as leaving the matter indeterminate, we have in the record the testimony of a considerable number of witnesses, some of whom had lived on the shores of Oyster Bay for a great many years and were familiar with the tide fluctuations in and about the pothole, all of whom testified that they never saw the greater portion, either of the pothole or of the channel leading therefrom, denuded of water during the lowest tides. Their testimony indicates that there was always a depth of from one to two feet of water in the pothole proper, and from four to six inches of water in the channel during low tide. . Some of the respondents' witnesses and one of the respondents himself testified to the same effect. To meet this testimony, the respondents introduced evidence to the effect that there are many springs flowing into the pothole from the upland, and sought to deduce therefrom that the water in the pothole during low tide comes from these springs, but the evidence shows that the water flowing out of the pothole during low tide exceeds in volume that flowing in from seepage and springs, and tends strongly to the conclusion that the water in the pothole at the lowest stage of the tide is not seepage from springs but is sea water.

We have examined the evidence with much care. We are satisfied that it strongly preponderates in favor of the view that both the pothole and the channel leading from it lie below the plane of extreme low tide, save certain insignificant portions around the border. We conclude, therefore, that the deed from the state to the respondents, which both

in law and by its terms conveyed nothing below the plane of extreme low tide, conveyed to the respondents neither the bed of the pothole nor of the channel, and that the title thereto still remains in the state.

We find no merit in the claim of the respondents to a title by adverse possession aided by improvements and payment of taxes. If we are correct in our findings on the evidence, it is clear that the respondents have no color of title, and the case therefore falls within the rule of *State v. Sturtevant*, *supra*, wherein we held that the possession of a mere squatter is insufficient to initiate a title by adverse possession or to start the running of the statute of limitations. We find nothing in the record sufficient to estop the state from asserting title to this land, and it is elementary that adverse possession cannot be made the basis of title as against a sovereign state. *State v. Seattle*, 57 Wash. 602, 107 Pac. 827, 27 L. R. A. (N. S.) 1188; *Brace & Hergert Mill Co. v. State*, 49 Wash. 326, 95 Pac. 278; *West Seattle v. West Seattle Land & Imp. Co.*, 38 Wash. 359, 80 Pac. 549. See, also, Rem. & Bal. Code, § 167 (P. C. 81 § 79).

It seems to be conceded that the description contained in the state's complaint is not an absolutely accurate description of the land lying below the line of extreme low tide as determined by the evidence of the state's engineer, Dohm, and as shown upon the map made by him which was introduced in evidence, showing the limits of the land actually below that plane. The judgment is therefore reversed, and the cause is remanded with direction to the trial court to permit the state to recast its description so as to include only those lands falling below the line of extreme low tide as shown upon the map, excluding, however, such parts of those lands as fall within any of the Callow grants, and enter a decree quieting title to the land so described, and in other respects as prayed for in the complaint. If any question is raised as to the correctness of the new description as compared with the map, the court is directed to take evidence and determine therefrom

whether such new description conforms to the map now in evidence, and from such evidence correct any discrepancy which may be made to appear.

MORRIS, C. J., MAIN, and FULLERTON, JJ., concur.