### CINCINNATI (city) v
### THOMAS J EMERY MEMORIAL

Ohio Appeals, 1st Dist, Hamilton Co

No 5003.  Decided March 30, 1936

58

John D. Ellis, City Solicitor, Cincinnati, and Edward F. Alexander, Assistant City Solicitor, Cincinnati, for plaintiff in error.

Wm. J. Rielly, Cincinnati, for defendant in error.

## OPINION

By HAMILTON, J.

Error to the Court of Common Pleas of Hamilton County.

The action was instituted by The Thomas J. Emery Memorial against the City of Cincinnati to recover a money judgment, and also praying that a restraining order issue against the City of Cincinnati. The Court of Common Pleas rendered judgment in favor of the plaintiff, The Emery Memorial and this proceeding is prosecuted to reverse that judgment.

The controversy grows out of a written agreement under which the City of Cincinnati agreed to furnish water to the Mariemont Company, a corporation. The contract was entered into by the Mariemont Company, through its duly authorized officers, and by the City of Cincinnati through its Director of Public Service, authorized by Ordinance No. 62—1923, passed March 27, 1923. The first paragraph of the contract provides:

"FIRST: That The Company agrees to purchase from the City at the price hereinafter stipulated, for a period of twenty (20) years from the date of approval of this contract by ordinance of Council as provided in §3973, GC, water to be used by said Company for manufacturing and other purposes, and The City agrees to furnish such water from its surplus water supply which together with other portions of said surplus heretofore contracted for by said City shall not exceed fifty (50) per cent of such water supply; said water to be furnished upon the terms and conditions specified therein.

"SECOND: All water-mains necessary for the supply to and the distribution in the property owned by The Company shall be laid at the expense of the Company, and under the general supervision of the Superintendent of the Water Works of said City. It is agreed that no part of the money expended by The Company for the supply and distribution of the water to The Company shall under any circumstances be refunded by The City."

The contract provides for the location and the size of the mains. The mains were laid within the City limits. The contract gives the City the right to use the mains so laid for spur lines for its future use. It provides for the installation of two (2) twelve-inch (12 in.) meters, the location of the same to be provided by the Superintendent of Water Works.

The contract provides:

"SIXTH: The Company agrees that all material and workmanship entering into the extension of the supply-mains and the distribution system, and all work done in connection therewith during the existence of this agreement shall conform to the general specifications of the Cincinnati Water Works, and inspection by the Superintendent of said Water Works or his duly authorized assistants or employees."

Paragraph ten provides:

"TENTH: The Company agrees to pay to The City for all water so furnished at a rate per one hundred (100) cubic feet equal to one and one-half (1½) times the prevailing rate to consumers within the City. * * *."

The prevailing rate at the time of the contract was 12c per 100 cubic feet, and no provision for a sliding scale for quantity use existed.

So that the Company constructed the mains and under the terms of the contract provided the equipment for the furnishing of water. The contract was entered into July 24th, 1923. Thereupon, the City be-

gan to furnish water to the Mariemont Company.

The Mariemont Company was engaged in developing a 400 acre tract of land into what it called a model city. The tract was adjacent to the City of Cincinnati. As the development proceeded, additional water was used. Bills for the same as provided in the contract were rendered monthly, at the rate of 18c per 100 cubic feet. For more than seven years this arrangement continued, satisfactory to both parties.

In 1931, the Mariemont Company sold and assigned all its rights, title, and interest in the property held by it to the defendant in error, The Thomas J. Emery Memorial. a corporation under the laws of Ohio; The Thomas J. Emery Memorial Company assuming all the liabilities of The Mariemont Company, and succeeded to all its rights.

If the contract for water was assignable, which the City denies, then the Thomas J. Emery Memorial succeeded to all the rights of the Mariemont Company under the contract.

Everything was satisfactory and the parties proceeded to operate under the contract until May 1st, 1931, when the City of Cincinnati adopted a new schedule of water rates, which provided that consumers within the City of Cincinnati pay 12c, the old rate, on the first 1000 cubic feet consumed, 11c on the next 9.000 cubic feet, and a continuing sliding scale depending on the quantity consumed. Notwithstanding the adoption of the new schedule of rates, effective May 1st, 1931, the City continued to bill the Mariemont Company and its successor, the Emery Company, at the original 1½ times the basic 12c rate. The Company upon receipt of the bill protested that they were entitled to the prevailing rate, which meant a reduced rate on quantity service from May 1st, 1931. The Company paid the bill as demanded under protest, and continued to do so until a threat by the City to turn off their supply of water. Thereupon, this action was brought to restrain the City from turning off their water supply, and to recover overpayments, to-wit, the difference between the old rate and the new in amount, $3083.94. This amount is not in dispute except as to certain quantity furnished the Mariemont Company beyond its needs.

The City set up several defenses in its cross-petition, which in substance set up the defense that the City was without power to enter into the contract; that the contract is void as lacking in mutuality;

that the Company was breaching the contract by reselling the water to other consumers; and that the contract was indefinite and uncertain by reason of the fact that it does not state any quantity of water to be furnished; and denies that the contract was assignable or that it conveyed any interest to the Memorial Company.

As to the indefiniteness of the contract, which goes to the question of mutuality of consideration, it is true that the contract does not state any particular quantity of water. It says "water to be used by said Company for manufacturing and other purposes, and The City agrees to furnish such water from its surplus water supply." This does not state that the water to be such as the needs of the Company require, or what its requirements would be, but we have in the record what took place at the time the contract was negotiated, and in view of the fact that the term is indefinite, the evidence is properly admitted to show what water the contracting parties referred to. At the time the plat for the Mariemont Subdivision, or as it was called by the parties, the Model City, was before the city officials, plans and profiles were presented showing what the parties intended, which was to lay out streets, to build model homes, with the necessary public buildings, the installation of sewer and water service, and mains to be laid in the streets of the model city, and from this there could be no question that the City agreed to furnish the water for this contemplated project, based on the plans and specifications considered. Based on that application, the City agreed to furnish the water under certain terms. The important ones were that the City should be put to no expense for the water mains in the City which were laid at distant points from the Mariemont project. It required the Mariemont Company to lay the mains at its own expense, which the Company did at the cost of nearly $80,000.00. These mains, in effect, belong to the City, since there could be no reimbursement to the Mariemont Company, they could not be removed. and they were installed under the supervision of the Superintendent of Water Works of the City of Cincinnati, and were used by the City in its service to the citizens of the City of Cincinnati. The City supervised the placing of the master meters for measuring the water service.

At the time of entering into the agree-

ment, no water was used by the Company, and it could not proceed with the development of its project until it had procured the supply of water, and that ▮ supply would be in accordance with the plans and specifications submitted to the City. So that there is nothing illusory about the proposition as to what water was meant.

It is claimed that the City had no power to enter into the contract. §3973, GC, provides:

"* * * A municipality which has water works may dispose of surplus water, for manufacturing or other purposes, by lease or otherwise, upon such terms as are agreed upon by the director of public service or trustees and approved by the council thereof. * * *."

This contract does no violence to that statute and the statute is sufficient authority, if it were necessary. It may be well doubted whether or not under the circumstances of this case, statutory authority is needed. It has been held and it is the law that the municipality in the operation of water works do so in a proprietary capacity and should be subject ▮ to the same rules of law as other contracting parties. However that may be, we find that the section of the statute is sufficient to empower it to enter into the contract.

As to the question of whether or not the contract was assignable:—It is true the contract between the Mariemont Company and the Emery Memorial contains no words of assignability, but the general assignment of all property and interest would carry sufficiently the fact of assignment if the contract was assignable. It is the law that contracts which run with the ▮ land are assignable with the land. We have the situation here of a contract having been entered into for the water service to homes to be constructed and public buildings to be constructed, and this must necessarily be a right running to the benefit of such properties, and, must therefore, be held to be a covenant which runs to the benefit of those properties. It is not a personal contract, which are the only contracts nonassignable.

The record is that the City with knowledge of the transfer of the contract to the Emery Memorial continued to operate under the contract, sent bills for the water consumed, according to the rates of the master meter, and made no objection to the assignment.

In 67 Corpus Juris, p. 1210, §703, it is stated:

"Where for a number of years, a city has acquiesced in the assignment by a water company of its rights and privileges under a contract with the city, and allowed the new company during such time to perform the contract of its assignor, the city cannot question the legality of the assignment for the purpose of avoiding performance of the contract on its part." Citing Austin v Bartholomew, 107 F. 349.

We also find in 67 Corpus Juris, p. 1210, §703, the holding:

"Where a water company, acting as an intermediary, and deriving its supply under certain contracts from another company, assigns all its right to a municipality, which, among others, it had supplied, such municipality is entitled to the continued supply of water to itself from the supplying company for the period for which compensation by both municipality and the assigning water company had been agreed upon and is ascertainable."

So whether or not there is a waiver as to the assignment, the law is that under the circumstances the contract is ▮ not a personal one, and the service known to be required is a covenant running with the land.

We are of opinion that the contract was assignable.

We are also of opinion that ▮ the city is estopped to set up the defense referred to.

There is but one reason suggested in the defense and in the conduct of the city in its objection to the contract, and that is the price to be charged. The City has not asked a cancellation of the contract. It has not challenged the contract except in a collateral attack set up in this case.

In the action at bar, there is no cross-petition asking a cancellation. It has performed under the contract for approximately ten years, and the only reason it desires to cease operations is as heretofore stated, the question of price. The City contends that the contract intended to give the City the right to charge on the basic price of 1½ the 12c rate; that that is the basic rate, and also that prevailing ▮ meant the larger rate. We cannot agree with the City as to this. "Prevailing" is defined by

lexicographers as meaning "current." Undoubtedly this was the meaning given by the parties; that at whatever rate the city furnished water to its inhabitants, the Company should be furnished water at 1½ times that rate. So that there is no basis for the claim that prevailing had reference to the larger rate of 12c per 100 cubic feet. Moreover, in the new rate of May 1st, 1931, the quantity consumed is provided for at a special rate, so that there could be no prevailing rate as to quantity. The rates are referred to as "First." "Next," "Next," etc. We find no substance in the contention of the City concerning prevailing rate.

We are further of the opinion that the City is estopped to set up the defense referred to.

In the Restatement of the Law of Contracts, §90, page 110, it is stated:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

A collation of the cases bearing on this proposition are found under §90, in the Supplement to the Restatement of Law of Contracts.

See also: syllabus in **Saunders v Galbraith, 40 Oh Ap 155, (11 Abs 34).**

The City at no time asked for a cancellation or rescission of the contract by separate suit, nor by way of cross-petition or answer in this suit. All that it does in its defenses in this action is to make a collateral attack on the agreement, rather than a direct challenge.

The City has acquiesced in the contract for more than ten years, more than seven years before the change in the water rate, and for nearly three years by continuing to furnish water and bill for the water furnished. It knew at the time the contract was made the service that would be required. It caused the Company to expend hundreds of thousands of dollars, based on this contract. It caused the Company to construct water mains at an expense of nearly $80,000.00. It superintended the work under the contract. It reserved use and does use the mains so laid by the Company in furnishing water to its citizens. To refuse to perform the contract, as shown by the evidence of the case, would be a disaster to the Emery Memor-

al Company and the many inhabitants and home owners of the Subdivision. Irreparable injury and great injustice would result.

Having found that the Company is entitled under the term "prevailing rate" to the schedule adopted by the City, effective May 1st, 1931, under the terms of the contract, the Company is entitled to have the City perform under the contract and is entitled to a permanent injunction, restraining the City from cutting off its supply. so long as the Company pays the charges under the schedule effective May 1st, 1931. The overpayments may be recovered.

It appears that the Mariemont Company and its successor have served some water outside of its district, which contemplated service was not submitted to the City at the time of the inception of the agreement. As to this service, the City was not bound to respond under the contract, and had the city sought relief in that regard, the company might have been enjoined from so furnishing the water. The water furnished has been paid for, or payment tendered, so that there should have been no relief as to that. However, the trial court did grant relief to the City, based on water furnished by the Mariemont Company, or its successor, outside of the district, and the Emery Memorial Company makes no complaint as to this and files no cross-petition in error concerning this deduction from the over-payment.

We find no prejudicial error in the record, and the judgment is affirmed.

ROSS, PJ, and MATTHEWS, J, concur.